### In re Application of William J. Clark.

First Judicial District, Hartford, May Term, 1894. Andrews, C. J., Torrance, Fenn, Baldwin and Hamersley, Js.

Section 91 of the General Statutes (being in substance a law continuously in force since 1750) provides that the grand jurors in each town may meet to advise concerning offenses committed therein; that at such meeting they may call before them witnesses to be examined touching the same, and that if any such witness shall refuse to answer a proper question, they may complain to a justice of the peace who shall cause the witness to be brought before him and committed to jail, there to remain until he shall give evidence as required. *Held* that the statute does not create a criminal offense, nor relate to a judicial proceeding, and does not call for a regular trial and judgment in the manner required for conviction of an offense on a criminal prosecution; and that the statutory conditions for the issuing of a mittimus by a justice are sufficiently complied with, if upon the witness being duly brought before him and given an opportunity to answer, the justice is convinced in any satisfactory manner and finds that the witness refuses to answer a proper question. *Held* also that the statute was not, on that account unconstitutional, as authorizing the imprisonment of the witness without due process of law.

[Argued May 1st—decided September 1st, 1894.]

Application for a writ of *habeas corpus*, brought before

the *Hon. Arthur D. Warner*, judge of the Court of Common Pleas for Litchfield County, and heard upon the defendant's demurrer to the reply of the plaintiff; the judge overruled the demurrer, held the reply sufficient, and discharged the plaintiff from imprisonment, and the defendant appealed for alleged errors of the judge. *Error and case remanded for judgment in accordance with opinion.*

The defendant, James A. Cochrane, deputy sheriff of Litchfield county made return to the writ of *habeas corpus* which issued upon the plaintiff's application, as follows:—

"In obedience to the within writ and by virtue of the same, I have the body of the within named William Clark now before the Hon. Arthur D. Warner, judge of the Court of Common Pleas for Litchfield County, and for cause of his detention and imprisonment by me I assign and state that on the 24th day of March, 1894, I arrested the said William Clark and took him into custody by virtue of a mittimus to me directed in the words and figures following:—

"STATE OF CONNECTICUT, }
        Litchfield County.     }

" To the Sheriff of the County of Litchfield, his deputy or either constable of the Town of Sharon and to the keeper of the Jail at Litchfield in said County, Greeting :

" Whereas at a court of enquiry held at Sharon, in said County, by George H. Smith, Charles Hollister, Leander H. Bartram and George M. Marckus and Simeon B. Jewett, grand juror, being at least three grand jurors of said Sharon, on the 23d day of March, 1894, at 11 o'clock in the forenoon of said day, met and convened to advise concerning offences committed in said town of Sharon, William Clark of New Milford having appeared before said grand jurors as aforesaid and having been duly sworn to testify before said grand jurors so sitting as a court of enquiry, on being required and demanded wilfully and contemptuously neglected and refused to answer the following proper questions, to wit :

" Did you see Mr. Anthony purchase liquors at Mr. Kirby's which was delivered in bottles afterward to Mr. Addis? which question the said William Clark refused to answer,

and the said William Clark was thereupon asked the following question:

" Did you purchase any liquors at Mr. Kirby's on Sunday in October, 1893 ? which question the said William Clark refused to answer. The witness was then asked the following question :

" Did any one in your presence purchase any liquors at Mr. Kirby's on Sunday ? which question the said Clark refused to answer. The witness was then asked the following question :

" Did you take any liquors from Kirby's which you afterward delivered to Mr. Addis ? which question the witness refused to answer. The witness was then asked the following question :

" While you were at Kirby's hotel, staying over Sunday, in October, 1893, did you, or any one in your presence, purchase any liquor of Kirby on that Sunday ? which question said Clark refused to answer. The witness was then asked the following question :

" How much liquor did you or Anthony take away from Kirby's with you ? which question the said Clark refused to answer. The witness was then asked the following question :

" How much liquor did you deliver to Mr. Addis that you had purchased at Kirby's ? which question the said Clark refused to answer ; and said grand jurors thereupon finding that said questions were proper and that the said William Clark wilfully and contemptuously refused to answer said questions ; and said grand jurors thereupon ordered that the said Clark be committed to the common jail at Litchfield, in said county there to remain, at his own expense, until he shall answer said questions and give evidence as required by law ; and said grand jurors, George H. Smith, Leander H. Bartram, Charles Hollister and George M. Marckus thereupon complained to the undersigned Wilson P. Sturges, a justice of the peace for the County of Litchfield, that being the county in which such meeting of said grand jurors was held, who thereupon caused said William

Clark to be brought before him, and the undersigned finds that said grand jurors aforesaid were met and convened in said Sharon to advise concerning offences committed therein, and were sitting as a court of enquiry in said town, and that William Clark appeared and was before said grand jurors so met and convened as a court of enquiry, as a witness and was duly sworn to answer proper questions, and that the said William Clark wilfully and contemptuously refused to answer the questions heretofore set forth, which questions were proper questions, and that the said William Clark wilfully and contemptuously neglects and refuses to testify before said grand jurors.

" Wherefore, You are hereby commanded to take the said William Clark and him commit to the keeper of the jail in and for the County of Litchfield, who is hereby commanded to receive the said William Clark into his custody and him safely keep within said jail at his own expense until he shall answer said questions and give evidence as so required or be otherwise legally discharged. Hereof fail not but due service make and leave with said keeper this mittimus.

Dated at Sharon this 24th day of March, 1894.

WILSON P. STURGES,

Justice of the peace for Litchfield county.

" I therefore assign the premises aforesaid as the cause of this detention and imprisonment of the said William Clark by me. JAMES A. COCHRANE,

Deputy sheriff of Litchfield County."

The plaintiff made reply to this return as follows :—

" The plaintiff says that the return made by the defendant is insufficient because he says that it appears in and by said return that the mittimus therein set forth was not issued in pursuance of a judgment rendered by the said Wilson P. Sturges, justice of the peace, who signed said mittimus ; and because it does not appear in and by said return that said Clark was put to plea or answer said complaint of said grand jurors when brought before said justice of the peace ; and because it does not appear by said return that the said Clark was allowed an opportunity to be heard by himself or

by witnesses in answer to said complaint or that he was confronted by the witnesses against him; and because it appears by said return that the plaintiff is detained in custody and defrauded of his liberty without due process of law by the defendant in violation of the fourteenth amendment of the constitution of the United States; and in denial of his rights to a hearing upon said complaint of said grand jurors before said justice of the peace; and because it does not appear in and by the return that the said grand jurors required the plaintiff to answer any questions relating to any offence committed in said town of Sharon; and because it does not appear by the allegations of said return that the questions which the plaintiff was ordered to answer were proper or pertinent questions; and the plaintiff further says that at the time he was brought before said justice of the peace to answer to said complaint of said grand jurors he demurred to said complaint of said grand jurors on the ground that the same was insufficient but the said justice refused to hear or decide said demurrer or to receive the same, and that the then plaintiff therein claimed the right to plead not guilty to the complaint and to answer the allegations thereof; but the said justice refused to allow him the privilege of pleading to or answering the allegations of said complaint; and the plaintiff claimed the right to be confronted with the witnesses against him, but the said justice of the peace denied him that right; and that plaintiff further says, that no hearing was had upon the allegations of said complaint of said grand jurors by the said justice of the peace and that no witnesses were called or testimony taken thereon by said justice of the peace, and that no judgment was rendered thereon, and that the said justice of the peace denied to the plaintiff the right to be heard in opposition to the allegations of said complaint by himself and by witnesses. He therefore prays that he may be discharged from the custody of the defendant."

To this reply the defendant filed the following demurrer:

"The defendant, James A. Cochrane, deputy sheriff, demurs to the reply of the plaintiff to his said return to said

writ of *habeas corpus*, and for cause of demurrer assigns the following: 1. Because said reply is insufficient in law to entitle the plaintiff to be discharged. 2. Because it is not stated in said reply that the justice issuing said mittimus had no jurisdiction or legal authority to issue the mittimus set forth in the return. 3. Because said return shows a commitment by a committing magistrate regular and valid upon its face. 4. Because this court upon *habeas corpus* cannot inquire into irregularities or errors of procedure in the case upon which the applicant was committed. 5. Because in hearing upon *habeas corpus* the court is not a court of revision and can make no inquiry as to the sufficiency of the evidence, or inquiry as to the guilt or innocence of the plaintiff in the cause upon which the applicant was committed. 6. It is not necessary that the mittimus in said return should set forth the matters complained of in the applicant's reply. 7. Because the return shows the applicant was lawfully held upon a legal and valid mittimus."

The judge overruled the demurrer, except the fifth and sixth reasons, which were sustained, and discharged the plaintiff, and the defendant appealed.

*Leonard J. Nickerson*, with whom was *Wellington B. Smith*, for the appellant (defendant).

I. The court erred in discharging the plaintiff. The return sets forth a warrant of commitment regular and valid upon its face. There is no question made in this case but that justice Sturges was a duly elected and qualified magistrate of Litchfield county. The grand jurors of the town of Sharon had made a complaint to him as a justice of that county. Upon that complaint, he, as such justice, had caused the plaintiff, Clark, to be brought before him. When Clark was before him, he had jurisdiction to issue a mittimus, and, as a justice of the peace, he exercised that jurisdiction and issued the warrant of commitment set forth in the return.

The mittimus was in the usual form, and legal and valid. 2 Swift's Digest, 794; Civil Officer (14th Ed.), 136. It is

not necessary that the mittimus should set forth the entire record of the justice; nor is it necessary that it should set forth that the defendant was put to plea, or confronted with witnesses; nor what interlocutory proceedings took place before the justice. It is sufficient if it set forth the name of the person committed, the subject, or matter for which he is committed and the order to the officers to commit. 15 Am. & Eng. Ency. of Law, 694; Church on Hab. Cor., 382, § 298; *State* v. *Tennison*, 39 Kan., 726; *People* v. *McCurdy*, 68 Cal., 576.

II. The applicant claims that the justice in arriving at the findings made by him proceeded erroneously and irregularly.

We respectfully submit that the matters and claims set forth in his reply to the return are not proper subjects of revision upon *habeas corpus*. The commitment being in due form, and in conformity with the statute, and the justice having jurisdiction, the party being before him, errors and irregularities of procedure are not proper subjects of revision upon a writ of *habeas corpus*. *In re Bion*, 59 Conn., 389–392, and cases there cited. The applicant was clearly liable to be committed to jail until he answered the questions set forth. They were legal and proper questions. *State* v. *Teahan*, 50 Conn., 94, 95, 100.

If it is claimed in behalf of the applicant that he is committed for contempt, we reply : That a judgment for contempt cannot be impeached for error or irregularities. An attack on such a judgment goes to the power to act. On *habeas corpus*, in cases of contempt, the only question is one of jurisdiction. 9 Am. and Eng. Ency. of Law, 215, 216 ; *Ex parte Kearney*, 7 Wheat., 39; Church on Habeas Corpus, §§ 281, 341; *Ex parte Ah Bau and Ah You*, 10 Neb., 264.

III. If, however, this court proceeds to go back of the mittimus and back of the record, and inquire what was done by the justice, it will be found that he did precisely as the statute required. The proceedings were under § 91 of the General Statutes, and the provisions of that section were strictly followed and complied with.

The applicant says he is deprived of his liberty without

due process of law and in violation of the fourteenth amendment of the Constitution of the United States.

This is not a penal statute. No person need suffer from its provisions for a moment. The applicant was deprived of his liberty by his own act. He could have answered the questions and never been put under arrest. He could have consented to answer when before the justice and never been committed. When a man is deprived of his liberty, who can by his own act, at any time, regain that liberty, he cannot complain of an invasion of his constitutional rights, while he refuses to pronounce his own deliverance.

This statute was followed literally in this case. The magistrate even went a step further and himself found every fact required by the statute to hold the witness. The statute having been strictly followed and the commitment being by the authority authorized by the statute to make it, the applicant was held by due process of law.

*Daniel Davenport*, for the appellee (plaintiff).

I. An examination of the terms and history of General Statutes, § 91, shows that the accused was entitled to a trial before the justice and that there must be a judgment of conviction as the basis of a mittimus.

Prior to the Revision of 1849 the statute provided that upon complaint of the grand jurors the person complained of should be brought before a justice and, "on conviction" be committed to the jail, etc.

It is not to be supposed that the revisors of 1849 intended by the omission of the words "on conviction" to deprive a person brought before a justice upon a complaint of the grand jurors of the right, enjoyed for a century previous, to be heard in his own defense, and of a trial and conviction before being committed to jail for an indefinite period, and it will be presumed that they thought the statute plain enough without the presence of those words. If they did intend to deprive the accused of such a hearing, for an offense not committed in the presence of the court, the law is unconstitutional. *Welch* v. *Barber*, 52 Conn., 157; *Whitcomb's Case*,

120 Mass., 124; *Bostwick* v. *Isbell*, 14 Conn., 307.   Upon the foregoing construction of the statute the return of the officer to the writ of *habeas corpus* is plainly insufficient, both for what it fails to show and for what it does show upon its face, and upon the facts set up in the reply the appellee was entitled to his discharge.

II.  In *habeas corpus* proceedings, the prisoner held under a mittimus is always permitted to show the non-existence of any fact necessary to give the committing magistrate authority to act in the matter.   Every jurisdictional fact may be inquired into, even when it contradicts the record, and especially when the record is silent upon the fact.   This principle in no wise conflicts with the other principle that in such proceedings mere irregularities or errors of procedure in the case upon which the applicant was committed are not to be inquired into.   *Hill* v. *Goodrich*, 32 Conn., 588; *Sears* v. *Terry*, 26 id., 280, 284; *Yudkin* v. *Gates*, 60 id., 430; *Emery's Case*, 107 Mass., 172; *Burnham* v. *Morrissey*, 14 Gray, 238.   It is a jurisdictional requisite that the party complained against and brought before the justice should be allowed to be heard in his own defense, and to be confronted with the witnesses against him.   This is the very object for which complaint is made, and the accused is brought before the magistrate.   The denial of this right is, in legal as well as practical effect, to proceed against him in his absence and without an opportunity to be present.   And the magistrate has no more power to commit in the one case than in the other.   The whole proceeding becomes thereafter a nullity.   *Windsor* v. *McVeigh*, 93 U. S., 277, 278; *Bradstreet* v. *Neptune Co.*, 3 Sumn., 601; *In re Ayres*, 123 U. S., 485; *Ex parte Rowland*, 104 U. S., 604; *In re Lavin*, 131 id., 278; *In re Cuddy*, 131 id., 286; *Ex parte Adams*, 25 Miss., 884; *Mayfield* v. *State*, 40 Texas, 290; *Ex parte Langdon*, 25 Ver., 680; *In re Pollard*, L. R. 2 P. C., 106; 1 Burn's Jus., 409; 1 Robinson's Justice, 542.

The 14th amendment to the constitution of the United States prohibits a State from depriving any person of life, liberty or property, without due process of law.   The intent

of these provisions is to secure the individual from the exercise of the powers of government, unrestrained by the established principles of private rights and distributive justice. *Pennoyer* v. *Neff*, 95 U. S., 733; *People ex rel. Witherbee* v. *Supervisors*, 74 N. Y., 234; *Zeigler* v. *L. & N. Ala. R. Co.*, 58 Ala., 599.

The proceedings disclosed by the record were in disregard of these constitutional guarantees, and the fundamental rights of the appellee as a citizen of the United States were infringed upon under the machinery of the State of Connecticut, and this court is bound to secure to him the protection guaranteed by the fourteenth amendment. *Robb* v. *Connolly*, 111 U. S., 636–639; *Ex parte Royall*, 117 id., 247; *Ex parte Virginia*, 100 id., 346, 347.

HAMERSLEY, J. There are two questions presented by this case : *First*, does § 91 of the General Statutes authorize a justice of the peace to issue a mittimus without a regular trial and judgment? The section is as follows :—

"The grand jurors in each town, or any three of them, may meet to advise concerning offenses committed therein, and may call before them, at such meetings, any witnesses, to be examined touching the same ; and if any person shall refuse to appear before them at such meeting, being summoned by competent authority, they may apply to a justice of the peace for a *capias*, who may issue one to bring such person before them ; and if any person appearing, or, being brought before them, shall refuse to be sworn, or, being sworn, shall refuse to answer any proper question, they may complain to any justice of the peace in the county where such meeting is had, who shall cause such person to be brought before him, and commit him to jail, there to remain, at his own expense, until he shall give evidence as required. Said grand jurors, when so met, shall have all the powers of a justice of the peace, when holding court, to commit for contempt."

The claim is, that the refusal to answer a proper question, asked in pursuance of this section, constitutes an offense ;

that the complaint to a justice of the peace is the commence-ment of a prosecution by complaint; that upon such prosecution the witness is entitled to a trial, as in any prosecution for a criminal offense; and that a mittimus for his commitment to jail can issue only after final judgment has been rendered. This meaning imputed to the statute would practically destroy its efficiency. A witness who refuses to answer need only demur to the complaint made to the justice, appeal from the judgment on the demurrer to a higher court, and before the case is determined the occasion for which the question was asked may have passed. Such was the course attempted in this case. The words of the statute will not bear such a construction; and although the statute in various forms has been in force since 1750, and has been in constant use as a means for the detection of crimes, yet no record can be found that the claim now made by the plaintiff has ever before been intimated.

The plaintiff suggests that the fact that in the Revision of 1821, and until the Revision of 1849, the statute read as follows: "Such grand jurors may make complaint to any justice of the peace, who shall cause such person to be brought before him, and, on conviction, shall commit him to the common jail"—proves that until 1849 a trial by the justice was necessary, and that the omission of the words "on conviction" in the Revision of 1849, did not alter the law. The words "on conviction" which were retained in the statute until 1849, will not bear the interpretation which the plaintiff gives them. These words were used in the original Act of 1750, and their meaning clearly appears by that Act. The Act provides that the grand jurors in each town shall meet once in three years, or oftener if necessary, "to advise concerning such breaches of law as by their office they are to inquire after, and present, and shall have power to call before them * * * any persons as witnesses, in order to be examined touching such delinquency as they are inquiring after; and if any person refuse to appear * * * upon being summoned thereto by warrant from an assistant, or justice of the peace, (who are hereby directed to grant such war-

rant, on request of such grand jurors) or shall refuse to be examined upon oath, if thereto required, such witnesses may, by such assistant, or justice, on conviction of such refusal, be committed to the common jail." "On conviction of such refusal" as thus used, did not mean on conviction of an offense after trial, but simply meant, on being convinced of such refusal in any satisfactory manner, and especially by the persistence of the witness in his refusal; and the meaning then attached to the words has never been changed.

In 1644 a grand jury was required to appear before every court yearly "to make presentment of breeches of any laws or orders, or any other misdemeanors they know of in their jurisdiction." 1 Colonial Records, 91. In 1668 at least one grand juror was required to appear from each plantation in the county. 2 Colonial Records, 98. In 1680 it was ordered that the grand jurors appointed by the County Courts should serve at least one year. 3 Colonial Records, 52. In 1681 the oath prescribed for grand jurors, who had now become a permanent inquest, was altered so as to include the obligation "with all due care and faithfulness to make diligent search" for violations of law, as well as presentment of those within their knowledge. 3 Colonial Records, 95. In 1712 each town was required to appoint two or more grand jurors to serve as before, whose names should be returned to the clerk of the court, and a sufficient number of them be summoned as needed.

It will thus be seen, that the grand jurors of the towns were officers, annually appointed, and not only constituted the grand inquest of the county attending the superior courts for the purpose of presenting crimes, but were also charged with the duty at all times of making diligent search, with all due care and faithfulness, for the discovery of violations of law, and of presenting offenses discovered, to the judicial authority in each town, as well as at the sessions of the court.

The Act of 1750 practically authorized a local inquest to be held in each town as well as the grand inquest at the sessions of the court, and directed an assistant, who was a

judge of the highest court, or one of the justices of the peace, who was eligible to sit as judge of the County Court, to issue the warrants necessary to enable the local inquest to perform its duties; and it is evident that when the Act directed such judge to commit a witness who refused to be examined under oath, upon conviction of such refusal, it did not contemplate any formal trial, or any hearing different from that which might precede the ordering of a mittimus if the judge were holding court and had occasion to commit a witness who refused to be examined under oath before a grand jury.

The statute of 1750 has been modified in the process of time, both by changes in phraseology and in the duties of grand jurors and justices; but there has been no change in the purpose of the Act or in the authority for the summary commitment of a witness who refuses to testify. The omission of the words " on conviction," when the legislature enacted the Revision of 1849, was probably made because the words had lost much of their original significance, or were deemed unnecessary in the present form of the Act, or liable to misconstruction ; but, however that may be, it is clear that the alterations in the Act made in 1849 were intentional, and that the Act as altered does authorize a justice of the peace to issue a mittimus without a regular trial and judgment; and this operation of the Act has been unquestioned for nearly fifty years.

*Second :* Is the issue of a mittimus, in pursuance of § 91, in violation of any provision of the constitution ?

The plaintiff claims that his imprisonment under the mittimus was unconstitutional, because the statute authorized the mittimus to issue only upon conviction of a criminal offense, after trial ; that the mittimus was in fact issued without such trial, and therefore he was imprisoned without due process of law.

This argument of the plaintiff would be conclusive if his construction of the statute were correct. His brief also claims that the statute is unconstitutional if his construction is not correct, and as the discharge of the plaintiff by the court

below was right if the statute authorizing the imprisonment is in violation of the Constitution, we must consider that question.

Section 91 does not create any criminal offense, nor does it relate to any judicial proceeding. The imprisonment imposed is not a penalty for any crime. It simply imposes a duty on the citizen, and seeks to enforce that duty when immediate obedience is essential by the temporary restraint of the person. The restraint of the person may be authorized by the legislature without the intervention of any court, in many cases where such restraint is necessary to the execution of the law and the enforcement of police regulations. The defendant in a civil action who refuses to turn out property for attachment may be committed to jail without trial. Selectmen may, without trial, take children from the custody of parents who neglect them, and bind them out to masters. General Statutes, § 2109. For certain infringements of the pauper laws they may, without trial, order an inhabitant of another State to be forcibly taken out of this State, and may expel from their town the inhabitant of another town; §§ 3292, 3293. A tax collector may, if necessary, commit to jail a citizen refusing to pay his taxes, there to remain until payment is made, or he be discharged in due course of law; § 3889. A collector who fails to collect and pay over the taxes may himself, without trial, be committed to jail, as on execution after judgment; § 3879. The moderator of any town meeting, or of any meeting of any society or other community, may order into custody any person who refuses to submit to his lawful authority, and have him forcibly removed until he shall conform to order; § 52. The instance are numerous and familiar where officers are authorized to restrain, without trial and even without process, persons who persist in the open violation of law. This power of summary compulsion to compliance with law may be committed to administrative as well as to judicial officers; and when committed to judicial officers they act solely in an administrative capacity, unless the power is exercised in the course of judicial proceedings.

Section 91 relates wholly to administrative proceedings. It is a police regulation for the purpose of protecting society against crime, by providing efficient means for the discovery of crime and the detection of the criminal. Our State has followed a policy different from that of England in the investigation of crimes. From a very early period in our history we have charged public officers with the duty of investigating as to the commission of offenses, and have invested them with the power of compelling witnesses to give the evidence necessary to discover the crime and the criminal. A remedy for the defect in the law of England in this respect has been under consideration since the introduction in Parliament of the Criminal Code Bill in 1880. In other countries the power of investigation is much more extensive. In India, England has established a carefully guarded system. Code of Criminal Procedure, § 154, *et seq.* But the power to authorize such investigation is inherent in every government, and the extent and manner of its use rest in discretion of the legislature, subject to constitutional limitations.

In this case the law imposed upon the plaintiff the duty of answering the proper questions put to him by the grand jurors. The legislature clearly has the right to enact such a law. His continued refusal to answer was an open and persistent defiance of the law when public interest demanded immediate obedience. The power of the legislature to authorize his restraint or imprisonment so long as he continues in such open defiance of law cannot be questioned.

It is true that the right to examine a witness and to compel him to testify, belongs to courts of justice, and is an essential part of a judicial proceeding; when he refuses to testify the judge may require him to answer or stand committed; there is no trial of such witness, he is not committed as a punishment, but to enforce a particular duty; and no evidence need in such case be taken. Wharton's Criminal Pleading and Practice, § 967. And when this power of compulsion is exercised by a court of justice, it is natu-

rally held that the exercise should conform, as far as practicable, to the analogies of judicial proceeding.

But it is also true that the power itself, while essential to judicial proceedings, is not distinctively a judicial power; it may be exercised by administrative as well as by judicial officers, and is in its essence, so far as it can be called distinctive of any department, distinctively an administrative power. The principle on which the power rests is, that when immediate enforcement of law is essential to its execution, the State cannot permit a citizen to obstruct, by his disobedience, such immediate execution of law, and has the power to invest the officer charged with the administration of law, whether he be a judicial or administrative officer, with authority to compel, in such case of emergency, immediate obedience in the manner prescribed by law.

The real nature of the power to compel a citizen to answer a proper question, when a refusal to answer obstructs the necessary, immediate execution of law, has been obscured by the habit of calling every such refusal a contempt. It is a contempt, in the sense that every open defiance of law is a contempt of the authority of the State ; it is a contempt of court when done in the course of a judicial trial; but the summary enforcement of an answer is not an exercise by the court of its judicial power to punish contempt of court as a criminal offense, but of its administrative power to enforce a law, which if enforced at all must be enforced at once. In *Commonwealth* v. *Willard*, 22 Pick., 476, Chief Justice SHAW, says : " To give effect to this power it must be so applied as to compel a specific performance of this duty. If it be said, that a witness may be indicted and punished, as for other breaches of duty, the answer is obvious, that besides the long delay and postponement of trials which this would occasion, the witnesses called to prove the case against the contumacious witness, might, in their turn, refuse to attend or to testify. Indeed, the necessity for the existence and exercise of this summary power to compel actual and prompt attendance of witnesses, and to require them to testify, is too plain to be seriously questioned."

In re Application of Clark.

This distinction is clearly marked in our legislation. The power to commit for a refusal to answer, given to every court, is not called a contempt, but is a power given to enforce the duty to appear and testify. General Statutes, § 842. While the power given to every court to punish for criminal contempt is given as a distinct power. General Statutes, § 843. There are many instances where this power has been committed to administrative officers. County commissioners are authorized to compel, by commitment, information necessary to the enforcement of their administrative duties. The board of pardons has like authority in the performance of its executive duties. Police commissioners of cities have like authority and the commitment may be ordered by the commissioners, and the mittimus signed by their clerk. General Statutes, § 165. The coroner may exercise the same power in the investigation of crime. The same power is inherent in the legislature without the enactment of a special law. The same power has been committed by the legislature to special commissions charged with obtaining information necessary to public interests. A noted instance is the commission of which the late Chief Justice Seymour was chairman; and the commitment of such power by the legislature to administrative officers has been held to be constitutional. *Noyes* v. *Byxbee*, 45 Conn., 382. In that case this distinction is drawn: The power to compel a witness to answer is inherent in a court of justice; but when the power to summon and examine witnesses is given to a mere administrative officer, the power to compel an answer cannot be inferred, but must be clearly given by statute. There is no power more essential to government than the power to discover and detect crime. In the exercise of that power the legislature has authorized grand jurors to summon witnesses before them, and to compel answers to proper questions. This is an exercise of that police power essential to the existence of government, and does not violate any constitutional guaranty relating to the course of proceedings in judicial trials. The witness imprisoned in strict pursuance of that statute is imprisoned by due course of law, as

truly as a prisoner duly convicted of a crime. Imprisonment in strict accordance with that statute involves, besides the official character of the persons acting under it, the refusal of the witness to answer a proper question put by the grand jurors, the application to a justice, the appearance of the witness before the justice, his continued refusal to answer, a finding by the justice of the facts necessary to commitment, a mittimus accurately reciting such facts, and signed by the justice. The finding by the justice of the necessary facts is not a judicial act, and does not involve a trial; the finding is of that *quasi* judicial character which characterizes the formation of opinion by every administrative officer when he is called upon to perform a ministerial act which the law authorizes only upon the existence of certain conditions. *Yudkin* v. *Gates*, 60 Conn., 426.

If any person is imprisoned under this statute, but not in strict pursuance of its provisions, he may be discharged upon *habeas corpus*. Upon such *habeas corpus* the court may be called upon to decide the following questions: the official character of the grand jurors and justice; the legality of the mittimus on its face; the propriety of the question asked; and if a case can be imagined where the mittimus has been issued after the witness has answered the question, that fact might be at issue. It is difficult to see, and unnecessary now to determine, what other questions could arise. A proper question is any question the witness may legally be compelled to answer; the pertinency of the question must be largely if not wholly left to the judgment of the grand jurors. They are authorized to investigate in secret session. The whole object of their investigation might be defeated by disclosing to a witness the purpose of a question. We do not, however, say that their authority may not be so abused in pursuing an unjustifiable investigation, that the witness will be entitled to protection. The fact that we have no knowledge of such abuse during an administration of the law for one hundred and fifty years, does not demonstrate that such abuse may not occur in the future. In *Anderson's Case*, decided in chambers by the late Chief

Justice STORRS in 1858, it was held that a witness imprisoned for refusal to give evidence which might tend to criminate him, must be discharged on *habeas corpus;* but the judge carefully avoids saying that in other cases the decision of the grand jurors and justice may not be conclusive. The correctness of that decision cannot be questioned; and the principle on which it rests would require the discharge on *habeas corpus,* of a witness imprisoned under this law, in case, if such case could arise, such imprisonment violated any other guaranty of the Constitution. While the constitutionality of this Act has never been directly decided, it has never been questioned, and was plainly recognized in the case of *In re Clayton,* 59 Conn., 510. In that case a commitment under a law authorizing the examination as a witness of a person who had been convicted of drunkenness, as to how he had obtained the liquor which caused his intoxication, and authorizing his commitment in case of refusal to answer, was held to be legal and in due course of law. The court says: "For more than a century and a half we have had upon the statute book a law authorizing the grand jurors in the several towns to meet and advise, and inquire into the offenses that had been committed, with power to summon and examine witnesses, and, if need be, to punish for contempt. This proceeding is but an extension of the same power to other officers, for the same general purpose, namely, the protection of society, by preventing crime through the detection and punishment of offenders. * * * This objection misconceives the nature and character of the proceeding before the police court. The appellant was not then before the court as a defendant in a criminal prosecution. That had been his position; but upon his conviction that was changed, and he became, so far as this case is concerned, merely a witness. He was in no sense on trial—no one was —and therefore was not in jeopardy. The proceeding was not judicial, but ministerial. * * * It is the duty of all good citizens, when legally required so to do, to testify to any facts within their knowledge affecting public interests; and no one has a natural right to be protected in his refusal to discharge

this duty. Public policy does not forbid, but on the contrary often requires, legislation to facilitate the administration of justice."

Judged by the analogies of past legislation, § 91 is a lawful exercise of legislative power, and in the case above cited we held that compelling a witness by commitment to give proper information essential to the investigation of crime, was not an unwarranted exercise of judicial power by the executive department, where such compulsion was enforced by a magistrate acting in a ministerial capacity. The strongest case cited by the plaintiff, apparently in conflict with the doctrine of *In re Clayton*, is *Whitcomb's Case*, 120 Mass., 118. In that case the court held that a law authorizing a city council to commit a witness for refusal to testify, was in violation of the Constitution of Massachusetts. The decision is based in part on the special phraseology of the Massachusetts Constitution, particularly of the clause granting power to the legislature to establish municipal governments, in connection with the fact that at the time the Constitution was adopted it was no part of the law of the land that municipal boards of officers should have power to punish for contempt. The expressions relied on in this case relative to the general relations of the several departments of government, must be read in connection with the particular facts and the particular constitution under discussion. The rule invoked by the plaintiff is not necessarily involved in the decision of *Whitcomb's Case*. It is the broad rule, that a constitution establishing separate departments for the exercise of the powers granted, and vesting the judicial power in one department, necessarily forbids the legislature to authorize administrative officers, in the exercise of legitimate executive power, to use any method found essential to the exercise of that power which is also a method in common and necessary use in judicial proceedings; and that any act done in pursuance of such legislation is necessarily in violation of the constitutional guaranty, that " no person shall be deprived of life, liberty, or property, but by due course of law." This guaranty of the Constitution relates primarily to the protection of the individual against

unlawful acts of executive or judicial officers, and is not by it-
self a limitation on the power of legislation. "Due course
of law" was originally synonymous with "law of the land."
This guaranty, as it first appears in our declaration of rights,.
(Laws 1672, page 1,) is against any acts not warranted by
"some express law of this Colony." But the establishment
of governments under written constitutions, without altering
the meaning of the words, gave an effect to their operation
which was not felt in England, nor in Connecticut until
1818. The written Constitution placed limitations on the
exercise of legislative powers. A law inconsistent with such
limitation is not law. Hence an act warranted by a law
inconsistent with such limitation is done without "due
course of law." And so in determining the validity of an
act claimed to be obnoxious to this ancient guaranty, we
may have not only the original question, is the act clearly
warranted by any law, but also the additional question, is
the law authorizing the act itself inconsistent with the limi-
tations contained in the fundamental law? But this differ-
ence is only apparent. Under a written constitution the
substantial question is the same as it was before such con-
stitution was known—is the act authorized by the law of the
land? It is authorized, if warranted by any specific law,
unless such law is a mere color of law by reason of its
inconsistency with the fundamental law. Hence, in each
case when an imprisonment in pursuance of statute law
is claimed to be without due process of law, the question
must depend on the circumstances of that case, not upon
the meaning of "due process of law," for that meaning is
well settled; but upon the compliance of the particular stat-
ute with the fundamental law limiting the exercise of leg-
islative power.

This view of the origin and meaning of the phrase
"due process of law," is suggested in the opinion delivered
by Justice MILLER in *Davidson* v. *New Orleans*, 96 U. S.,
97. See also *Lawton* v. *Steele*, 152 U. S., 133; *Marchant*
v. *Penn. R. R. Co.*, 153 U. S., 380. No general definition
of the acts which, done under color of law, are without

due process of law can be given, because the definition in each case depends not so much upon the quality of the act, as upon the relation of the particular law authorizing it to the fundamental law which limits the power of the legislature. And so, in dealing with the provisions of § 1 of article XIV. of the amendments to the Federal Constitution, the United States courts have in the main avoided general definitions, and treated each case as suggested in *Davidson* v. *New Orleans*, in view of the question whether the acts in that case are warranted by the law of the land. It cannot safely be affirmed that the phraseology of this amendment alters the meaning of "due process of law," as understood at the time this guaranty to the individual against the unlawful exercise of power by the agents of government was first incorporated into State constitutions, and into the United States Constitution by article V. of the amendments.

If this view of the constitutional guaranty be correct, the imprisonment of the plaintiff was by "due process of law." If it be claimed that the examination by the grand jurors, and the commitment of the plaintiff to compel an answer to a proper question, was in the nature of a judicial proceeding, and that the law authorizing such a proceeding by administrative officers is in violation of the provisions of the Constitution dividing the functions of government and vesting the judicial power in the courts, the sufficient answer is, that these great functions of government are not divided in any such way that all acts of the nature of the functions of one department can never be exercised by another department; such a division is impracticable, and if carried out would result in the paralysis of government. Executive, legislative, and judicial powers, of necessity overlap each other, and cover many acts which are in their nature common to more than one department. These great functions of government are committed to the different magistracies in all their fullness, and involve many incidental powers necessary to their execution, even though such incidental powers in their intrinsic character belong more naturally to a different department. No act can be more clearly within the functions of

the judicial department than the enforcement of the payment of a debt, by the confiscation of the property and the imprisonment of the person of the debtor; but when the legislature finds it necessary to the full execution of the powers confided to the executive department, to authorize such collection of debts due the government without recourse to the courts, such a law is not in violation of the division of powers made by the Constitution. In *Murray* v. *Hoboken Land Co.*, 18 Howard, 272, cited and approved in the opinion of Justice MILLER, 96 U. S., 97, it was held that an Act of Congress authorizing the audit of the accounts of a collector of customs, and authorizing the solicitor of the treasury to issue a distress warrant for the collection of the amount of balance found due the government, was not invalid as authorizing the exercise by the executive department of a judicial power; and that the levy of such warrant was not a violation of the guaranty of article V. of the amendments, that no person "shall be deprived of life, liberty, or property, without due process of law." And in disposing of the claim that the law of Congress was invalid, because the duty it authorized the treasury department to perform was in fact a judicial act, Justice CURTIS says: "So are all those administrative duties the performance of which involves an inquiry into the existence of facts and the application to them of rules of law."

It is unnecessary to multiply illustrations of this essential principle of constitutional law, that a statute authorizing administrative officers to perform executive functions by methods which partake of the judicial nature, is not necessarily in violation of the constitutional provisions dividing the functions of government and vesting the judicial power in courts. The real question in each case is, not merely whether the act is of a judicial nature, but whether the act is legitimately incident and necessary to the execution of powers confided to the executive and legislative departments, and not obnoxious to any prohibition of the Constitution. This question has been answered by the application of various tests. The one most frequently applied is the inquiry

whether the particular act has been treated as a legitimate exercise of executive power prior to the adoption of the Constitution.  As a determination of principle by the process of analogy, such inquiry is useful, convenient, and in most cases, conclusive; but can hardly be accepted as necessarily conclusive.  The constitutional definition of the three departments of government cannot wholly depend upon the actual legislation in England, when Parliament was little more than a court to register the expressions of royal will; or in Connecticut, when absolute political power was concentrated in a General Court, and the effect of the common law was given to the penal codes of the Israelites.

Another test not infrequently applied is the inquiry whether the act in question is a legitimate exercise of the police power necessarily inherent in government.  The term "police power" is often used as a term of convenience and not of clearly ascertained legal principle.  It was found to be the most convenient phrase for designating the extent of State legislation, when such legitimate legislation covered the same ground included in the exclusive power of legislation given to Congress; notably in the wide field covered by the power to regulate inter-state and foreign commence.  As used in this connection the term has acquired a more definite meaning through the many decisions of the United States Supreme Court, but such meaning relates rather to what it has been decided to cover, than to what it may in fact cover.  As Justice GRIER says in the *License Cases*, 5 Howard, 504 : " Without attempting to define what are the peculiar subjects or limits of this power, it may safely be affirmed, that every law for the restriction or punishment of crime, for the preservation of the public peace, health, and morals, must come within this category."  But the term is much more indefinite when used to designate that exercise of executive power which involves and justifies, as a necessary incident, the performance of acts by administrative officers that may partake of a judicial nature; and the necessity for its use in this connection, except as a term of convenience, is much less obvious.  The truth is, that all such tests are

useful aids in applying to each case the principles of consti-
tutional law that must control.  Our State Constitution
vests in the three departments of government the whole
political power, and the power to be exercised in the several
departments is co-extensive with the exigencies of govern-
ment, except as its exercise is restrained by the declaration
of general principles and the specific limitations embodied
in the Constitution itself, including the United States Con-
stitution, which is also the fundamental law of each State.
The mere apportionment of political power to separate de-
partments does not diminish the political power vested in
the government, and so, when the exigencies of government
demand the exercise of executive power involving as a nec-
essary incident the use of methods which are also necessary
to the exercise of judicial power, the authorization by the
legislature of such exercise of power in such manner, is a
legitimate exercise of the legislative power.  The legisla-
ture must determine the existence of the exigency and of
the necessity, and the courts must be the final judge in each
case, whether such particular exercise of legislative power
has been restrained by the general principles or specific
limitations contained in the Constitution.  The determina-
tion of such limitations of legislative power is often one of
the most difficult and delicate questions that can be pre-
sented to the court; but the decision becomes more easy
when it is remembered that the real question as to the ex-
ercise in such case of a judicial power exclusively vested in
the courts, is one of substance and not of form.  The lan-
guage used by Justice HARLAN in the recent case of *Mug-
ler* v. *Kansas*, 123 U. S., 623, 661, while discussing the
limitations imposed by the United States Constitution on
State legislation in the exercise of police power, applies as
well to the question under discussion : " While every pos-
sible presumption is to be indulged in favor of the validity
of the statute, the courts must obey the Constitution rather
than the law-making department of government, and must,
upon their responsibility, determine whether, in any partic-
ular case, these limits have been passed. * * * The courts

are not bound by mere forms, nor are they to be misled by mere pretenses. They are at liberty—indeed, are under a solemn duty—to look at the substance of things, whenever they enter upon the inquiry whether the legislature has transcended the limits of its authority."

From whatever point of view we consider the imprisonment of the plaintiff, it was in "due course of law." The law authorizing it follows the analogies of our legislation long prior to the adoption of the Constitution, has been in force for one hundred and fifty years, and clearly comes within the most narrow definition of the police power inherent in the State government. It is also within the principles of constitutional law controlling such legislation. The power to punish crime and to preserve the public peace and morals belongs to the State government in all its fullness, and is essential to its existence. Legislation authorizing investigation as to the existence of crime is a legitimate exercise of this power; the conduct of such investigation prior to the prosecution of a person for the commission of a particular crime is beyond doubt an executive function, and in the execution of such investigation the State has the plainest right to proper information within the knowledge of every citizen, and to compel the disclosure of such information by any method consistent with constitutional limitations. In an emergency demanding immediate action it has the right to compel, as Chief Justice SHAW says, "the specific performance of this duty," obligatory on every person, and for that purpose to hold him in custody of the law. Such compulsion may be as essential to the efficient exercise of executive power as of judicial power, and its use by administrative officers is no more an infringement of the exclusive powers vested in the judicial department because such compulsion is in ordinary use in judicial proceedings, than is the summary enforcement of a debt to the government because the payment of debts can ordinarily be enforced only by judicial process issued upon judgment of a court; or the destruction of a building to prevent the spread of a fire ; or the taking of land to prevent the spread of disease,

because property can ordinarily be condemned only by judicial proceedings. It would indeed be unfortunate if the strength of the government, for the detection and prevention of crime, were crippled by any constitutional provision forbidding the legislature to enact laws similar to the one under discussion; but no such prohibition can be found, either in the declarations contained in our bill of rights, or in the specific limitations of our Constitution. It may be added, that this law, in authorizing a commitment to compel an answer to a proper question, follows the analogies and provides all the essential safeguards of a summary commitment by a court for a similar purpose; with the additional security that the remedy for illegal use of the power is more ample, because upon a writ of *habeas corpus* the court may inquire more freely into the legality of a commitment when made by an administrative officer, whose only authority must be found in a special statute, than when made by a court in which the authority to commit is inherent.

We conclude, therefore, that § 91 is an exercise of legislative power for a purpose included in the powers vested in the State government, and is not in violation of any provision of our Constitution, or of the United States Constitution applicable to the limitation of State legislation.

As § 91 authorized the justice of the peace to issue the mittimus in this case without a formal trial and judgment, and was a lawful exercise of legislative power, we find nothing in the record to authorize the discharge of the plaintiff by the court below. By his return the sheriff justified under a mittimus, valid on its face, reciting every fact required by law in order to authorize the issue of the mittimus. The plaintiff's reply does not contradict a single fact recited; it does not make a single allegation of fact inconsistent with the validity of his commitment; it substantially admits the official character of the grand jurors and justice of the peace; that the plaintiff appeared before the grand jurors lawfully convened under the statute, and was duly sworn; that the questions recited were asked him; that he willfully and contemptuously refused to answer the questions; that the com-

plaint was made by the grand jurors to the justice ; that he was duly called before the justice, and then persisted in his refusal to answer. The reply is substantially a demurrer to the return, for three reasons : 1. Because it does not appear by the return that the grand jurors required the plaintiff to answer any questions relating to any offense committed in the town of Sharon. It does sufficiently and clearly appear that the examination of the witness was concerning offenses committed in said town. 2. Because it does not appear by the return that the questions put to the plaintiff were pertinent or proper questions. It does clearly appear that the questions were proper questions. *State* v. *Teahan*, 50 Conn., 94. 3. Because it does not appear by the return that he was formally tried by the justice as for a criminal offense ; that he was allowed an opportunity to be heard by himself and witnesses in answer to said complaint; or that he was confronted by the witnesses against him ; and therefore it does appear that he was imprisoned without due process of law. The insufficiency of this reason has been shown; as the proceeding before the justice was a ministerial and not a judicial proceeding, the provisions of the Constitution relating to judicial trials do not apply.

The reply, in addition to the statement that these matters do not appear by the return, makes the same claim of the necessity of a formal trial, by way of alleging that the plaintiff demurred to the complaint, claimed the right to plead not guilty to the complaint, and to answer to the allegations of the complaint, and to be confronted with the witnesses against him ; that these claims were all denied, and that there was no such trial and judgment on the complaint. But the reply does not allege that the plaintiff was deprived of the opportunity of purging himself by answering the questions, or that he did not have full opportunity to make any statement or present any reasons he saw fit, why the mittimus should not issue, or that the justice did not have ample reason for making his finding as recited in the mittimus. On the contrary, the reply is a substantial admission of all these facts. The reply is simply a claim that the return

is no justification, because the mittimus could not issue except after a trial of the plaintiff and judgment against him, as in a criminal proceeding. This claim has no foundation in law. So far as the reply states this claim by way of demurrer, the reasons are insufficient, and so far as it states the claim by way of direct assertion, the allegations are irrelevant.

The court below should have adjudged the reply insufficient, and unless the plaintiff offered to prove facts showing illegality in the proceedings, should have forthwith remanded him to jail. The case as it appears before us, especially by the plaintiff's own claims, indicates that he openly and willfully obstructed the execution of the law. So long as he persists in such obstruction his imprisonment is lawful and well deserved.

There is error in the judgment appealed from, and the case is remanded to the Court of Common Pleas, to be proceeded with to judgment in accordance with this opinion.

In this opinion the other judges concurred.