THE NORWALK STREET RAILWAY COMPANY'S APPEAL.

Third Judicial District, Bridgeport, April Term, 1897. ANDREWS, C. J., TORRANCE, FENN, BALDWIN and HAMERSLEY, Js.

Article II of the Constitution of this State declares that the powers of government shall be divided into three distinct departments: the legislative, the executive, and the judicial; each one of which shall be confided to a separate magistracy. Article III declares that the legislative power of this State shall be vested in "The General Assembly"; and Art. V that the judicial power of this State shall be vested in a Supreme Court of Errors, a Superior Court, and such inferior courts as the General Assembly shall, from time to time, establish. *Held* that in view of these provisions the General Assembly could not authorize the

courts of this State, nor the judges thereof when acting judicially, to exercise powers which were essentially and distinctively legislative, and the execution of which was not incidental to the discharge of any legitimate judicial function.

The power of regulating the location, construction and operation of street railways, given to the local municipal authorities by Chap. 169 of the Public Acts of 1893, clearly falls without the limits of the judicial department. Nor can the exercise of such a power become a judicial function, merely because a statute (Public Acts of 1895, Chap. 283) gives the railway company a right of appeal to the Superior Court or any judge thereof, when the municipal authorities fail to exercise their powers within a limited time. Such "appeal" is not a process to invoke the judicial power, but is merely an application to the court or judge, acting in the place or stead of the municipal authorities, to exercise a legislative function.

The case of *Wheeler's Appeal*, 45 Conn. 306, overruled.

[Argued April 27th—decided July 13th, 1897.  Motion for rehearing denied November 5th, 1897.]

APPEAL from the action of the city authorities of Norwalk in refusing to approve the application and plan of the Norwalk Street Railway Company for double tracking a portion of its line, taken to the *Hon. F. B. Hall*, a judge of the Superior Court, by whom the cause was heard and judgment rendered for the railway company, and appeal by the city for alleged errors in the rulings of the judge. *Error and judgment reversed. Motion for rehearing denied.*

The petition in this case represents that on April 4th, 1896, the Norwalk Street Railway Company presented a plan for the location and construction of its railroad in the streets of the city of Norwalk, to the mayor and council of said city, and that the mayor and council failed to notify the petitioners, within 60 days of that date, in writing, of their decision upon said plan ; and asks the judge to accept or modify the same as he may deem equitable.   Due service of the petition was made.

Upon the hearing the mayor and council moved that the "appeal" be dismissed, "because the questions raised by this appeal involve only the consideration and determination of matters not of a judicial character, and the tribunal to which the appeal is taken has no jurisdiction to hear and de-

termine any matters except those of a judicial character."
This motion was denied, and the judge rendered a judgment
accepting and adopting a plan (being the plan presented to
the mayor and council, modified in some respects) for the
location and construction of the railroad.

The only questions raised by the assignment of errors and
pressed in argument, were: Can the "Superior Court or any
judge thereof" validly exercise a power which is not "a ju-
dicial power" within the meaning of the Constitution? Was
the action of the judge in this case an exercise of such judi-
cial power?

*Goodwin Stoddard* and *Edward M. Lockwood*, for the city.

The Federal Constitution and the Constitutions of all the
States contain a provision calculated and intended to assign
the functions of government to three separate and distinct
departments : the legislative, the executive and the judicial.
This provision is regarded as fundamental. ( The Federalist,
Nos. 47, 78 and 81; Cooley, Const. Lim. 44; Daniel Web-
ster's Works, vol. III., p. 29; *Hayburn's Case*, 2 Dall. 409;
*U. S.* v. *Ferreira*, 13 How. 39; *In re Application of the
Senate*, 10 Minn. 78. ) Even if, by the unusual condition
prevailing in Connecticut, the legislature is vested with
some powers properly belonging to another department, never-
theless, *in other respects the principles underlying constitutional
government are in force,* and prevent the imposition of non-
judicial duties upon the courts. *Starr* v. *Pease*, 8 Conn.
547; *Day* v. *Cutler*, 22 id. 625; *Wheeler's Appeal*, 45 id.
306; *Brown* v. *O'Connell*, 36 id. 432. The functions of the
three departments of government are clearly defined in the
following cases: *Wayman* v. *Southard*, 10 Wheat. 46; *Green-
ough* v. *Greenough*, 11 Pa. St. 489; *Hawkins* v. *Governor*, 1
Ark. 591; Cooley, Const. Lim. 111, 115; *Bates* v. *Kimball*,
2 D. Chip. (Vt.) 77; *Merrill* v. *Sherburne*, 1 N. H. 199;
*Taylor* v. *Place*, 4 R. I. 324, 332, 336; *State* v. *Railroad*, 6
Kan. 500, 576. Instances of legislative attempts to force
non-judicial duties upon the courts, have been somewhat in-
frequent. The usual breach of the constitutional provisions

has been by an assumption of power, and not by attempted delegation to an unwilling judiciary. But the question has at times arisen in the same form as in the present suit. *Hayburn's Case, U. S.* v. *Ferreira, supra.* In another class of cases the legislature has attempted to delegate the power of taxation. This is, of course, plainly a legislative function. *Rees* v. *Watertown,* 19 Wall. 107; *Heine* v. *Levee Com.,* 19 id. 655; *Munday* v. *Rahway,* 43 N. J. L. 338; *McLean Co. Precinct* v. *Bank,* 81 Ky. 254; *Tillinan* v. *Cocke,* 9 Bax. (Tenn.) 429; *Galesbury* v. *Hawkinson,* 75 Ill. 152; *Shumway* v *Bennett,* 29 Mich. 451; *People* v. *Carpenter,* 24 N. Y. 86; *State* v. *Armstrong,* 3 Sneed (Tenn.), 632; *People* v. *Nevada,* 6 Cal. 143; *Lathrop* v. *Stedman,* 42 Conn. 583; *State* v. *Noble,* 118 Ind. 359. The duties required of the court in hearing an appeal under this Act are not judicial, nor to be performed in a judicial manner, and the Act is therefore unconstitutional and void. The statute indicates the nature of the questions the court is called upon to deal with, viz.: what is the best kind of rail and how it should be laid; the motive power adapted to the town in question and its application to the rolling stock; in short, " it may include any order in the exercise or performance of municipal power or duty within a large proportion of the field of municipal administration." The considerations upon which the decision of the common council, as well as that of the appellate body, is to rest, are not to be found in rules of law or equity, nor in any analogies to these rules, but in expediency, in public policy, in balancing probabilities of advantage from one course or another. Such considerations are those upon which legislative, not judicial, bodies act.

*John W. Alling* and *George D. Watrous,* for the railway company.

The general argument which supports the proposition of the city is, that the three departments of the government, the legislative, executive and judicial, are distinct, separate and independent of each other; and that the assumption of any of the powers appropriate to one is an unconstitutional

invasion of the province peculiar to one of the others. If this proposition be true and the argument sound, no duty of any kind could be imposed by law upon a judge, which is not strictly judicial in its nature. *Starr* v. *Pease*, 8 Conn. 547; *Wheeler's Appeal*, 45 id. 306; *Smith* v. *Twelfth District Judge*, 17 Cal. 548. It was well said by Mr. Dorman B. Eaton, in Vol. 2, Cyclopædia of Political Science, p. 640, (that " in its last analysis the distinction between executive and judicial officers is lost in metaphysics.") See also Story on Const. A judge will be none the less a judicial officer because some duties he may have to perform are administrative in their character; nor will an administrative become a judicial officer simply because some acts which he may be required to perform may be to some extent judicial in their character. *Waldo* v. *Wallace*, 12 Ind. 583; *Mills* v. *Brooklyn*, 32 N. Y. 497; *Murray's Lessee* v. *Hoboken Land and Improvement Co.*, 18 How. 280; *In re District Attorney*, 23 Fed. Rep. 26. The power involved in the case at bar is certainly not legislative. *Wolfe* v. *M'Caull*, 76 Va. 880. The real question involved in cases of this character would seem to be this : Do public convenience and necessity require the construction of the railroad according to the plan submitted by the company, or otherwise? This question is preëminently a judicial one, and our statutes and reports contain numerous instances of the exercise of such powers by the Superior Court. This question ought to be regarded as no longer open for discussion in this State. *Central Ry. & Elec. Co.'s Appeal*, 67 Conn. 197, 214; *Hopson's Appeal*, 65 id. 146. The statute of 1895 was drawn in close analogy to the statute allowing an appeal from an order of the railroad commissioners to the Superior Court, and also to those statutes which permit a layout of a highway by the Superior Court. Cases arising under these statutes have been repeatedly before the Supreme Court, and their validity incidentally affirmed ; although, to our knowledge, they have never been directly called into question. Rev. of 1784, pp. 95–97; *Lockwood* v. *Gregory*, 4 Day, 407 : Gen. Stats. §§ 2669, 2777, 3233, 3245; *People* v. *Long Island R. R.*, 134 N. Y. 506; *Chicago, etc.*,

*Ry.* v. *Minnesota*, 134 U. S. 419; *Covington, etc., Turnpike Co.* v. *Sandford*, 164 id. 578. If the power conferred upon the court or judge is judicial, it follows that the Act is constitutional. The authorities presented in behalf of the city fail in their application to this case, for some one or another of the following reasons: 1. Because they rest upon constitutional provisions essentially different from those of Connecticut. 2. Because duties are imposed which are unquestionably non-judicial. 3. Because duties are declared non-judicial which in Connecticut are constantly discharged by courts.

HAMERSLEY, J. The Act of 1893* confers upon city councils certain powers in establishing regulations for the location, construction and operation of street railways; and requires

---

*Section two of Chap. 169 of the Public Acts of 1893, reads as follows: "Sec. 2. Whenever any railway company shall have been chartered by the general assembly of this State for the purpose of operating street railways in any town, city or borough, or whenever any such corporation already organized has been, or shall be given, the right to lay additional tracks in any such town, city or borough, or whenever any street railway company shall desire to change its motive power, before such company shall proceed to construct such railway, lay additional tracks, or change its motive power, it shall cause a plan to be made showing the highway or highways, street or streets, in and through which it proposes to lay its tracks, the location of the same as to grade and to the center line of said streets or highways, such change or changes, if any, as are proposed to be made in any street or highway, the kind and quality of track to be used and the method of laying the same, the motive power to be used in propelling its cars, and the method and manner of applying the same, (which plan shall be presented to the mayor and court of common council of any such city, the selectmen of any such town, or the warden and burgesses of any such borough, within their respective jurisdictions, who shall thereupon, upon public notice, proceed to a hearing of all persons interested therein, and after such hearings may accept and adopt such plan, or make such modifications therein, as to them shall seem proper, and shall, within sixty days after the presentation of such plan to the local authorities, notify said company in writing of their decision thereon, and of such modifications therein as they may deem proper. The refusal or neglect of any such local authority to notify said company of its decision within said period of sixty days as aforesaid shall be deemed to be a refusal to approve and accept said plan as presented by said company. Nothing in this act shall be construed so as to prevent such street railway company from presenting to such local authorities a plan or

a council, if requested by a railway company, to take some action within sixty days, and to notify the company in writing of its action. Whenever a council fails to give such written notice, the Act of 1895* confers the same powers upon the "Superior Court or any judge thereof," to be exercised on application of a railway company, and calls this application an "appeal." The power so conferred on the court is described in the Act of 1893 as the power to approve and adopt a location and layout of a street railway, with such

plans as heretofore provided, until said street railway company and local authorities shall agree upon the same, and no such company shall construct such railway, lay additional tracks, or change its motive power except in accordance with a plan approved by the authorities aforesaid."

*Section one of Chap. 283 of the Public Acts of 1895, is as follows: "Sec. 1. Whenever the warden and burgesses of any borough, the mayor and common council of any city, or the selectmen of any town shall make, pass, or render any decision, denial, order, or direction with respect to any matters relating to street railways which, by virtue of any public or private act or resolution, now are, or may hereafter be, within the respective jurisdictions of such warden and burgesses, mayor and common council, or selectmen, any street railway company affected thereby may appeal from any such decision, denial, direction, or order within thirty days from the service of notice upon such street railway company of the rendition, making, or passage of such decision, denial, direction, or order, to the superior court, or any judge thereof; such appeal shall be by petition to such court or judge, and shall state specifically the portion or portions of such decision, denial, direction or order appealed from, and the reasons of such appeal; and such court or judge shall order such notice as may be deemed reasonable to be given to such selectmen, mayor and common council, and warden and burgesses of the time and place of appearance in answer to such petition, and upon the time fixed for appearance and answer, or as soon thereafter as said court or judge shall order, such appeal shall be tried by said court or judge, and said court or judge shall make such orders in reference to said matters appealed from as may by it or him be deemed equitable in the premises, and the decision of said court or judge shall be final and conclusive upon the parties. And whenever such warden and burgesses, mayor and common council, or selectmen shall, under the provisions of section two of chapter CLXIX of the public acts of 1893, be deemed to have refused to approve and accept any plan presented by any street railway company, said street railway company shall have a like right of appeal therefrom to said superior court, or any judge thereof; and said court or judge shall have the same powers with reference to said plan and the acceptance or modification thereof that said municipal authorities would have had under the provisions of said act, and may make all such orders with reference thereto as may be deemed equitable."

modifications therein as shall seem proper, in respect to the streets to be occupied, the location of the same as to grade and to the center line of the streets, and changes to be made in the street, the kind and quality of the track to be used, the motive power to be used, and the method of applying the same.

Can such powers be conferred on the Superior Court? The limitation of their exercise to cases where there has been a prior failure of a municipal board to act, cannot affect the principle involved. If the legislature can confer the power in a limited class of cases, by calling an original application for its exercise an "appeal," it can confer the power in all cases, without limitation. (This court has said in *Brown* v. *O'Connell*, 36 Conn. 432, 446 : "No judicial power is vested by the Constitution in the General Assembly, either directly or as an incident of the legislative power, and the General Assembly cannot confer it. . . . It was one of the objects which the people had in view, in framing and adopting the Constitution, to divest the General Assembly of all judicial power. . . . While the entire legislative power is vested in the General Assembly, the judicial power is separated from it and vested in the courts 'as a separate magistracy.' It is obvious . . . that the judicial power is not conferred by the General Assembly, but vests, by force of the Constitution, in the courts. . . . It was therefore competent for them (the legislature) to provide for the organization of the court in question (a city police court), and to define the jurisdiction it should possess ; and when so constituted, the judicial power of the State vested in it, by force of the Constitution, to the extent of the jurisdiction so defined." In an opinion by JUDGES HINMAN, SANFORD, BUTLER and DUTTON, the Constitution is thus defined : " The Constitution of the State, framed by a convention elected for that purpose and adopted by the people, embodies their *supreme original will*, in respect to the organization and perpetuation of a State government; the division and distribution of its powers ; the officers by whom those powers are to be exercised ; and the limitations necessary to restrain the action of each and all for preservation

JULY, 1897.

of the rights, liberties and privileges of all; and is therefore
the supreme and paramount law, to which the legislative, as
well as every other branch of government, and every officer in
the performance of his duties, must conform. Whatever that
supreme original will prescribes, the General Assembly, and
every officer or citizen to whom the mandate is addressed,
must do ; and whatever it prohibits, the General Assembly,
and every officer and citizen, must refrain from doing; and
if either attempt to do that which is prescribed, in any other
manner than that prescribed, or to do in any manner that
which is prohibited, their action is repugnant to that supreme
and paramount law, and invalid." *Opinion of the Judges*,
30 Conn. 591, 593.

It is claimed that *Wheeler's Appeal*, 45 Conn. 306, 313,
recognizes a sovereign power in the legislature, not derived
from the Constitution, in addition to that embraced in the
grant of legislative power, and unrestrained by the division
of the powers of government into distinct departments ; and
this case is relied on as justifying the legislation now in ques-
tion. It is unnecessary to discuss the precise point deter-
mined by the judgment in *Wheeler's Appeal ;* but the ground
on which the opinion seeks to justify the judgment is erro-
neous. It is this : The opinion says it is " obvious, from the
past history of our own jurisprudence and long continued
legislative practice, that we have reserved a much larger field
for legislative action than has ever been recognized " in other
States. This divergence is due " in part, and perhaps princi-
pally, to the very extensive powers which were originally
conferred on the General Assembly by the charter of Con-
necticut." Under this charter the General Assembly exer-
cised executive and judicial functions. Upon the adoption
of the Constitution of 1818, which divided the powers of
Government, it was logical to hold that all judicial functions
of the General Assembly were at an end; and this claim was
made at an early date, but not accepted by this court. *Starr*
v. *Pease*, 8 Conn. 541, 547 ; *Day* v. *Cutler*, 22 id. 625 ;
*Booth* v. *Woodbury*, 32 id. 118, 126. "If, then, an Act of
the State legislature is not against natural justice, or the

national Constitution, and it does not appear affirmatively and expressly that there is some provision in the Constitution forbidding it, we must hold it to be *intra vires* and valid." There are no affirmative and express provisions in the Constitution forbidding the exercise by the General Assembly of the equity jurisdiction which in former days was exclusively exercised by the " General Court;" and so the proposition asserted is broad enough to justify Acts of the General Assembly administering this branch of jurisprudence.

Such a doctrine is subversive of the American idea of constitutional government. It affirms that the checks established by the division of governmental power have no existence in this State; that when the Constitution says " the powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy," it means,—" The General Assembly shall exercise every power of sovereignty which it is not forbidden to exercise by some affirmative and express provision of the Constitution;" that the mandate, " the legislative power of this State *shall* be vested in two distinct houses . . . to be styled The General Assembly," does not mean what it says, but means " the Governor and Council and House of Representatives in General Court Assembled," shall continue, under the style of " The General Assembly," to exercise the supreme power of the State in all matters whatever, not forbidden by some affirmative and express provision herein contained; that the mandate, " the judicial power of the State *shall* be vested in a Supreme Court of Errors, a Superior Court " *etc.*, means nothing, or means, " such portion of the judicial power as the General Assembly shall not exercise by itself or other agencies."

This doctrine originates in an expression in the opinion of DAGGETT, J., in *Starr* v. *Pease, supra* (HOSMER, C. J. and BISSELL, J., concurred in the judgment, and PETERS, J., dissented),—an expression not necessary to support the judgment rendered, for the validity of a legislative divorce, the matter in dispute, must rest on the claim that it is a law fixing a *status*, on grounds of public policy, and is not a mere

adjudication of private rights. *Maynard* v. *Hill*, 125 U. S. 190. JUDGE DAGGETT says that it is urged that by the "new Constitution" there is an entire separation of the legislative and judicial departments, and that now the legislature can pass no Act not clearly warranted by the Constitution; that precisely the opposite of this is true: that from the settlement of the State there have been certain fundamental rules by which power has been exercised, which were embodied in an instrument, called by some a constitution and by others a charter; that the charter gave extensive power to the legislature and left everything, almost, to their will; that when the new Constitution was framed, it adopted a bill of rights, provided for the election and appointment of certain organs of the government, such as the legislative and other departments, and imposed on them certain restraints; that it found the State sovereign and independent, with a legislative power capable of making all laws necessary for the good of the people, not forbidden by the United States Constitution, nor opposed to sound maxims of legislation, and left them in the same condition, except so far as limitations were provided. This statement was substantially repeated in *Pratt* v. *Allen*, 13 Conn. 119, 124, although the judgment in that case was supported on other grounds.

In some respects the views of those engaged in framing a Constitution, as to its meaning, are entitled to peculiar regard; but not in all respects; and especially not as to the extent of the radical change involved in the adoption of a written Constitution. Such a change brought into existence an absolutely new branch of jurisprudence which judges, trained under a different and antagonistic system, were not peculiarly fitted to comprehend. In *Starr* v. *Pease*, however, the only judge who was a member of the convention of 1818, emphatically dissented. The error of JUDGE DAGGETT was fundamental; it was based on the denial of the essential meaning of a written constitution.

Prior to 1818, the whole sovereign power was exercised by the people, unrestrained by anything except their present will, through a body of magistrates chosen annually and deputies

chosen semi-annually. This was a democracy; as close to a pure democracy as it is possible for a representative government to be. There were certain forms established by legislation, and certain fundamental principles generally acknowledged as true and important; but there was no power that could enforce them. They depended on the unrestrained will of the people as expressed semi-annually. This body of laws and customs might be broadly called a constitution; but they were not, and the government was not a constitutional government in the American sense, which was then taking definite shape through the influence of the United States Constitution. There was no fundamental law made by the sovereign—the people—embodying their supreme original will, in pursuance of which and in accordance with which alone governmental power could be exercised. Such a law is in its very nature a grant of power—a grant by the sovereign to the governmental agencies established—a grant for the very purpose of preventing the sovereign from itself exercising the powers granted (for such exercise by the sovereign must of necessity be unrestrained and arbitrary). And so the grant is made to three distinct departments or magistracies, each deriving its delegated power direct from the sovereign, through the Constitution. The only sense in which a constitution may be termed a limitation rather than a grant of power, is that the power granted to each department is given broadly and covers the whole range of that division of power, except as limited by the constitution.

It was this new form of government that the people demanded and established in 1818. It was this new form of government that the advocates of the so-called charter government for thirty years successfully opposed. They claimed that they had a constitution, because they did not realize what a constitution meant, or were afraid of the restraints it imposed. The idea of a constitution was centered in the separation of judicial and legislative powers, and the grant of each power to a distinct magistracy. On this the fight for change of government was largely made.

When the legislature that called the convention of 1818

met, Governor Wolcott told them that their mandate from
the people was, " that the legislative, executive, and judicial
authorities of our own government be more precisely de-
fined and limited, and the rights of the people be declared
and acknowledged." The committee appointed on a revision
of the form of civil government, in their report, said, that the
State was then " destitute of fundamental laws defining and
limiting the powers of the legislature ; " that the organiza-
tion of the different branches of the government, and the
separation of their power, rested on " the frail foundation
of legislative will or discretion." The resolution reported
by them and adopted by the legislature recommended to
the people of the State to assemble and choose delegates
who should meet in convention, and if " by them deemed
expedient, proceed to the formation of a constitution of
civil government for the people of this State ; " and said
Constitution, when ratified and approved by the people,
" shall be and remain the supreme law of this State."

There was then a democracy exercising supreme power
through deputies chosen semi-annually, but no Constitu-
tion of civil government in the American sense of that
term. In these deputies, when assembled in General Court,
consisted " the supreme power and authority of this State ; "
when so assembled they had " the power and voice of all the
freemen deputing them," *i. e.*, the whole power vested in the
sovereign, the people. By virtue of this power so deputed,
they recommended to their sovereign to abolish the existing
form of government, to establish a new form of civil govern-
ment, and to appoint delegates to frame a constitution for that
purpose, which, when adopted by the sovereign, should be a
permanent grant of his power to the agencies therein named,
under the limitations therein expressed. This again was de-
clared when the convention met and " *Resolved*, that this Con-
vention do deem it expedient to proceed at this time to form
a Constitution of civil government for the people of this State."
The Constitution adopted declared that the people of Con-
necticut, grateful for having been permitted to enjoy a free
government, *i. e.* a democracy, in order more effectually to

define and secure the liberties derived from their ancestors, —the English heritage of civil liberty, heretofore resting on "the frail foundation of legislative will or discretion"—do "ordain and establish the following Constitution and form of civil government."

The convention adopted the Constitution on September 15th; the people approved and ratified it, and on October 12th, 1818, it became the Constitution of civil government of the people of Connecticut. On that day and thereafter all powers of government were exercised only by virtue of the authority granted in that instrument; it was "the original supreme will of the people" from which all authority was derived. This clearly appears from § 3 of Art. X, by which the existing rights and duties of corporations are established and confirmed, subject to the regulations contained in the Constitution; officers previously commissioned are authorized to exercise their offices until the first of June following; laws not inconsistent with the Constitution are continued in force until altered or repealed in pursuance of the Constitution; and the General Court to be formed in October is granted all powers not repugnant to the Constitution, which they now possess, until the first Wednesday of May following. When it is remembered that the last session of the "General Court" had no power whatever, except that granted by the Constitution, the theory that this General Court handed over to the General Assembly established by the Constitution, undefined sovereign power not derived through that instrument, appears in its naked absurdness. No declaration could be more clear and specific: that on October 12th, 1818, the democracy, first established in 1637, ceased to exist, and the General Court or assembly through which the powers of that democracy had been exercised, was then abolished, and every power of government thereafter exercised found its authority only in the Constitution of civil government then adopted by the people as the supreme law of the State.

This result was recognized by those who had opposed, as well as by those who had advocated, the revolution. Wil-

liam L. Stone, editor of the *Connecticut Mirror*, speaking for the former, said: " Our form of government, under which for near two hundred years all have enjoyed privileges and blessings unknown to any other people upon earth, has been swept away." John M. Niles, editor of the *Hartford Times*, speaking for the latter, said: " A government of men has been superseded by a government of laws; . . . distinct and independent bodies of magistracy have been constituted, their powers and duties defined, limited, and separated." Trumbull's Historical Notes·on the Constitutional Convention of 1818, p. 59.

The forms of procedure under the Constitution were so similar to those under the former government, and were so largely administered by men who were not only fixed in the old ways of thought but opposed to the radical change involved in the adoption of a Constitution, that it is not strange that some legislation should pass unchallenged, and *dicta* of judges pass current, clearly contrary to the supreme law. But the form of government established in 1818 cannot be destroyed in that way. This change in the structure of government was a pregnant fact which any one long settled in the belief that an exercise of the whole unrestrained powers inherent in an absolute democracy, through a body of delegates frequently chosen, furnished the best organic plan for ruling a commonwealth, might well find it difficult to accept in its full significance. The views of JUDGE DAGGETT, as expressed in *Starr* v. *Pease*, on the effect of a constitution, are those of an able and thoughtful jurist; but we find it more easy to reconcile them with the traditions in which he had been educated, and the conditions existing during the greater part of his long and extensive practice at the bar, than with the plain provisions of the Constitution itself. It was the expression of those views that led up to the *dictum* in *Wheeler's Appeal*. The other two cases cited do not support the *dictum*. *Day* v. *Cutler* was an action on a promissory note, which involved the validity of a legislative divorce. ELLSWORTH, J., assumed the validity of the divorce, and held the note given in connection with it to be valid, and

WAITE, J., concurred. HINMAN, J., tried the case below
and gave no opinion. CHURCH, C. J., said: "It may be too
late now to discuss the question whether, since the powers
of this government were separated, by the Constitution of
1818, and distributed to the distinct executive, legislative
and judicial departments, respectively, the General Assembly
can constitutionally exercise the power of granting divorces.
This has been doubted by some of our best jurists." But
passing that, he held that in any event the note in suit was
not valid; and in this opinion STORRS, J. concurred. *Booth*
v. *Woodbury* does not support but denies the *dictum;* the
court expressly says the legislative power is granted to the
General Assembly by the Constitution. We do not recall a
case that necessarily depends on the theory of JUDGE DAG-
GETT, followed in *Wheeler's Appeal*, unless it be that case.
Other utterances of this court are wholly inconsistent with
the theory. In the *Opinion of the Judges*, above cited, the
true meaning of a constitution is conclusively stated. In
*Brown* v. *O'Connell, supra*, the power of the legislature to
either exercise or confer judicial power, is denied. The case
of *In re Application Clark*, 65 Conn. 17, 41, plainly assumes
that the legislature is confined to the exercise of legislative
power. In *State* v. *Conlon*, ibid. 478, 488, we say: "The
'legislative power of this State' is, in the broadest terms
vested in the 'General Assembly.' This power is, in a cer-
tain way, defined and limited by the provisions dividing the
powers of government into distinct departments, and by
those relating to the operation of the State government and
duties of particular officers. But, unlike the constitutions
of many States, it contains no specific limitations on the ex-
ercise of legislative power, except some slight restrictions in
one or two recent amendments. The limitations, however,
are no less real, and perhaps more effective, than if phrased
in specific terms." In *State ex rel. Bulkeley* v. *Williams*,
68 Conn. 131, 149, the opinion of the court assumes that
only legislative power is granted to the General Assembly;
and the dissenting opinion of ANDREWS, C. J. (in this
matter not antagonizing the majority), states that upon the

ratification of the Constitution "the former government by General Assembly was finally and forever dissolved. The people in the exercise of their sovereignty, established a new government in three separate and independent departments, whose powers were to be exercised, and exercised only, in accordance with their 'supreme original will embodied in the Constitution.'" p. 169. But no *dicta* of judges, no doubtful or improper legislation, can alter the plain fact that in 1818 the people, in the exercise of their sovereignty, granted to the General Assembly then constituted the legislative power, and forbade their exercise of other than legislative power (unless specially granted) ; and granted to this court and other courts then constituted the judicial department, the judicial power, and forbade their exercise of other than judicial power. The assertion of original and consistent opponents of a constitution, that the victory of 1818 was a barren victory, that constitutional government, as known to the people of the United States, is unknown to Connecticut, and that the fundamental principles of constitutional law have here no existence, however often repeated, cannot affect the paramount authority of the supreme original will of the people as plainly declared in the Constitution itself. The unequivocal mandate therein contained, that the powers delegated or granted by the sovereign, the people, through the Constitution, shall be divided into three distinct departments, and those belonging to each confided to a separate magistracy ; and the equally unequivocal mandate, that the powers granted to the General Assembly (unless by some specific provision) shall be confined to the exercise of the "legislative power of this State," and the power granted to the judiciary shall be confined to the exercise of " the judicial power of the State," is binding upon this court at all times. These mandates are the voice of the sovereign speaking ever with a present authority from which there is no escape.

The incapacity of the legislature to execute a power which is essentially and merely a judicial power, and of the judiciary to execute a power which is essentially and merely a legislative power, as well as the limitation of the meaning of legis-

lative power by force of certain primary principles of government plainly embodied in the Constitution, and by the necessities involved in the separation and independence of distinct departments of government, are fundamental to the very existence of constitutional government as established in the United States. *Wilkinson* v. *Leland*, 2 Peters, 627; *Hoyston* v. *Williams*, 13 Cal. 24; *Taylor* v. *Porter*, 4 Hill, 140; *Cochran* v. *Van Surlay*, 20 Wend. 365; *Campbell's Case*, 2 Bland's Ch. 209.

This court has not hesitated to affirm and apply the principle here involved. *Brown* v. *O'Connell*, *Opinion of the Judges*, *In re Clark*, *State* v. *Conlon*, *supra*. We believe *Wheeler's Appeal* to be the only case that necessarily may involve a different view; but, for the reasons given, it is powerless to change the principle. The Supreme Court of the United States has uniformly held that a law conferring on the courts a power which is not a judicial power within the meaning of the Constitution, is unconstitutional, and that such power cannot be lawfully exercised by the courts. Note by court on *U. S.* v. *Todd*, 13 How. 52, 53; *Ex parte Siebold*, 100 U. S. 371, 393.

The power which *Judge Hall* was asked to exercise in the present case does not seem to us to be a judicial power within the meaning of our Constitution. It is claimed that the difficulty of defining the powers of government renders impracticable the enforcement by this court of their division, and so makes nugatory the most important command of the Constitution. A difficulty attends the application of a general principle to particular cases, and sometimes the more vital the principle the greater the difficulty. This was felt when the United States Supreme Court first dealt with a conflict between a law of Congress and the Constitution; it was felt still more when the court began to apply the general principle that a State law dealing with internal police may to a certain extent validly occupy a field of legislation within the exclusive jurisdiction of the United States. It is a peculiarity of the essence of constitutional government that the judicial department must deal with such difficulties;

VOL. LXIX—38

otherwise constitutional provisions for the guarantee of civil liberty, the harmonious separation of State and national functions, as well as the separation of governmental departments, become a solemn mockery. But the difficulty now alleged is more apparent than substantial. CHIEF JUSTICE MARSHALL says, " the legislature makes, the executive executes, and the judiciary construes the law." *Wayman* v. *Southard*, 10 Wheat. 1, 46. The Supreme Court of the United States, speaking by JUSTICE FIELD, says : " The distinction between a judicial and legislative act is well defined. The one determines what the law is, and what the rights of the parties are, with reference to transactions already had; the other prescribes what the law shall be in future cases arising under it." *Sinking Fund Cases*, 99 U. S. 700, 761. One controlling consideration in deciding whether a particular act oversteps the limits of judicial power, is the necessary inconsistency of such acts with the independence of the judicial department, and the preservation of its sphere of action distinct from that of the legislative and executive departments. A main purpose of the division of powers between legislature and judicature, is to prevent the same magistracy from exercising in respect to the same subject the functions of judge and legislator. This union of functions is a menace to civil liberty, and is forbidden by the Constitution. There is no intrinsic difficulty in recognizing a plain infraction of such prohibition. It is true that the different magistracies must act upon the same subjects; for every matter that may be dealt with by the State government may be acted on by each department thereof; but the action must be that belonging to the department whose powers are invoked. The main difficulties suggested in argument result from a failure to distinguish between the exercise of a legitimate power, and the employment of necessary means for exercising that power. The grant of the powers embraced in one of the great departments of government carries with it the right to use means appropriate to the exercise of that power. Any attempt to cripple the power through metaphysical classification of the means essential to its exercise must produce diffi-

culties, if not absurdities.    For example : the power to make
laws may require the accurate ascertainment of facts ; for this
purpose witnesses must be summoned, examined, and conclu-
sions drawn from their conflicting testimony.    This is a means
peculiarly appropriate to the judicial power and the ordinary
mark of an exercise of that power ; yet when so employed
by the legislature (without violation of other constitutional
provisions) it is a means within the limits of legislative power.
But should the legislature, after the passage of an Act, attempt
by another Act to adjudicate the rights of parties which have
arisen under its provisions, such Act, although only means
appropriate to legislation might be employed, would be an
exercise of judicial and not of legislative power.    It would
be void, because it involves the union, in the same magistracy,
in respect to the same matter, of the functions of judge and
legislator.    Again, there are certain necessary executive acts
which cannot be performed without the power of enforcing
immediate obedience to an order authorized by law ; the
employment of legal restraint for the purpose of securing the
essential immediate obedience, is a means peculiarly appro-
priate to the exercise of judicial power ; but, for such purpose,
and subject to the restrictions of other provisions of the Con-
stitution, it is a means within the limits of the executive
power.    *In re Application of Clark*, 65 Conn. 17 ; *Murray* v.
*Hoboken Land, etc., Co.*, 18 How. 272.    So, means of a legis-
lative nature must be used by courts in establishing neces-
sary rules of practice, and by executive officers in making
regulations for the conduct of subordinates.    Again, appoint-
ment to office is in the nature of an executive act ; apart from
the purpose of the appointment, it is an exercise of executive
power.    Our own Constitution like most constitutions, pro-
vides for certain elective and legislative appointments ; but
except in the cases specified, appointment to office is an exer-
cise of executive power, unless used as a means appropriate
to the exercise of power granted to another department ; and
when so used it is not the exercise of executive power within
the meaning of the Constitution.    The Constitution of the
United States specifies the methods of appointment.    Certain

officers must be appointed by the President in concurrence with the Senate; all other officers shall be appointed in the same way, "but the Congress may by law vest the appointment of such inferior officers, as they think proper, in the President alone, in the courts of law, or in the heads of departments." In commenting on this clause, the United States Supreme Court says that the appointing power designated in respect to inferior officers, "was no doubt intended to be exercised by the department of the government to which the officer to be appointed most appropriately belonged." *Ex parte Hennen*, 13 Peters, 230, 257. In affirming the validity of the law providing for the appointment of supervisors of elections by Circuit Courts, the Supreme Court held that there were reasons why such appointments might most appropriately be made by courts, relied on this clause as giving a certain discretion to Congress in assigning such appointments to the appropriate department, and, referring to the intimation in *Ex parte Hennen*, said: "In the present case there is no such incongruity in the duty required as to excuse the courts from its performance, or to render their acts void." *Ex parte Siebold*, 100 U. S. 371, 398.

Under our State Constitution appointments, other than those whose mode is prescribed, are governed by the division of governmental powers. This question has never come before us directly; it was incidentally considered in some recent cases in connection with the law allowing an appeal from the action of county commissioners in granting licenses. In *Smith's Appeal*, 65 Conn. 135, 139, we held that the statute required the county commissioners to select as the recipient of a license, one having "a personal fitness to perform the *quasi* public duties required by law of a licensee," *i. e.* one who is shown to be suited or adapted to the orderly conduct of a business which the law regards as dangerous to public welfare unless conducted by a carefully selected person duly licensed, whose fitness to the legal requirement must be determined in view of the statutory regulations. In *Hopson's Appeal*, ibid. 140, we held that the selection or appointment of such a licensee was a means apparently appropriate both

to the exercise of executive and judicial power; that the uni-
form practice of courts and legislature in so treating such
appointment might be safely accepted when the distinction
to be drawn must be subtle and doubtful; and that the action
of the Superior Court upon an appeal from the county com-
missioners is a judicial proceeding in so far that the judg-
ment of the court may be reviewed by this court when founded
on a misconception of the law (as was held in *Smith's Appeal*,
*supra*, and in *Beard's Appeal*, 64 Conn. 526), but that errors
claimed in the lawful exercise of discretion in making the se-
lection or appointment could not be reviewed.

Such proceeding by appeal is an anomalous one; it con-
founds process for invoking the exercise of judicial power by
way of ordinary judicial proceedings in protecting an individ-
ual against the illegal acts of a public officer, with the use of
the power of appointment as a means incident to the full
exercise of judicial power.   It is evident that the justification
of such judicial appointments must be found in the circum-
stances peculiar to each case.

While the necessity and right of each department to use
the means requisite to its unfettered operation, is clear, it is
equally clear that when one department not only uses the
means appropriate to another, but uses them for the purpose
of executing the functions of that other department, it is not
in the exercise of its granted power.   The legislature by ju-
dicial means may find the facts showing that a charter sub-
ject to repeal, ought to be repealed, and act in the exercise
of its legislative functions.   *Crease* v. *Babcock*, 23 Pick. 334,
344.   But when by the same means it attempts to adjudge
the forfeiture of a charter not repealable, it acts in the exer-
cise of a judicial function, and in excess of its power.   This
distinction is illustrated in the decisions of the United States
Supreme Court dealing with legislative regulations of charges
by railroad companies.   The regulation of such charges is
held to be distinctively a legislative function which may be
delegated by the legislature to a subordinate legislative or
administrative body, but if this subordinate body, or the leg-
islature, exceeds its powers, and a person is thereby injured

598 JULY, 1897.

Norwalk Street Ry. Co.'s Appeal. Vol. 69

in his rights of property, he may invoke the judicial power to determine that question of legal injury; and the reasonableness of the charges, although a question legislative in its nature, must be reviewed by the court as necessarily incident to the exercise of its judicial power. But if the court should attempt to establish for the future a schedule of charges, it would exceed the limits of judicial power; it would act as legislator in respect to a matter as to which it must also act as judge. As was said by MR. JUSTICE BREWER, in one of the latest of this class of cases: " The courts are not authorized to revise or change the body of rates imposed by a legislature or a commission; they do not determine whether one rate is preferable to another, or what under all circumstances would be fair and reasonable as between the carriers and the shippers; they do not engage in any mere administrative work; but still there can be no doubt of their power and duty to inquire whether a body of rates prescribed by a legislature or a commission is unjust and unreasonable, and such as to work a practical destruction to rights of property, and if found so to be, to restrain its operation." *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362, 397. The same distinction is noted by this court in referring to the anomalous process for protection against illegal taxation, provided by § 3860 *et seq.* of the General Statutes. In construing that statute we held that " the assessment of property for taxation is an administrative proceeding; the judicial power is called into action to remedy an illegal assessment;" but that the law did not impose upon the Superior Court the duties of assessors, nor purport to give the court general authority to review the action of the assessors or board of relief. *Ives* v. *Goshen*, 65 Conn. 456, 459. It is true, however, that in cases arising under statutes enabling the court to settle rights of person or property invaded by illegal acts of administrative boards, and which may be questioned rather for the defective process provided than for any substantial misconception of the limits of judicial power, this distinction has not been marked as it must be when the validity of a statute is directly put in issue. We think this distinction is decisive of the present case.

The meaning of the Act of 1893 relating to street railways, is uncertain in several particulars; but there can be no doubt that it confers on municipal authorities, in addition to certain executive powers, the power of establishing regulations and conditions (within the limitations prescribed) which shall control all the street railways in the State, in the location, construction and operation of railways. There can be no doubt that making such regulations is essentially and distinctively a legislative function. It is also certain that the judicial power does not include the exercise of such a legislative function; and that the duty of making such regulations cannot be imposed upon the Superior Court, because it involves the exercise of legislative power by the court, and because a power in the legislature to impose such duties is inconsistent with the existence of an independent and separate judicial department of government. The power to make the Superior Court a subordinate legislative body for one purpose involves the power to so utilize it for every purpose.

But it is equally certain that the judicial power does extend to the protection of every right of person or property that may be invaded by a municipal council in the unlawful exercise of the powers conferred by the Act of 1893. This judicial power may be called into action by any appropriate process. The Act of 1895 provided, among other things, that an aggrieved person might appeal from an order made by a municipal council in pursuance of the Act of 1893; that such appeal should be a petition to the court which should specifically state the portion of the order appealed from and the reasons, and be served on the council, and that such appeal should be tried by the court and appropriate judgment rendered. Construing this Act as we have construed other Acts authorizing appeals from the action of legislative and administrative boards, as providing a nondescript kind of process intended to serve the combined purposes of a writ of injunction, *certiorari*, and mandamus, or of any other process for invoking the judicial power to determine a legal injury complained of, we substantially held in

the *Central Ry. and Electric Co.'s Appeal*, 67 Conn. 197, 214, that a party aggrieved by such illegal order might find lawful redress in this way; our attention was not directed to the possible limitations of the redress. We went to the farthest limit in our desire to give effect to a legitimate intention of the legislature most inadequately expressed. But the Act of 1895 goes farther, and contains an additional provision which is not fairly susceptible of being construed as merely providing for a process to bring into action the judicial power of the court, and which, without any action by a municipal council other than a failure to act within a limited time, purports to transfer to the court all the powers conferred upon municipal councils by the Act of 1893. The distinction between the two provisions of the Act is vital. The application to the court in such case is called an "appeal;" an unfortunate name, because it does not express the real function of the process. "Appeal," in the sense of transfer of jurisdiction from one court to another, cannot be predicated of any process by which a court is called upon to determine the legality of an act done by officers of another department. In this sense there can be no appeal from a common council to a court, any more than there can be an appeal from the legislature to the court, or from the court to the legislature. In appeals from the Court of Probate to the Superior Court, we sometimes speak of the Superior Court as being for that case the court of probate, and speak correctly; for probate jurisdiction is within the judicial power, and may be exercised by the Superior Court; but when we speak in the same way, as occasionally we have spoken, in commenting on the discretionary power that may be exercised in one of these amorphous "appeals" from administrative boards, the expression is allowable only as a figure of rhetoric.

The so-called "appeal" in this case is not a process to invoke the judicial power; it is simply an application to the Superior Court to exercise a legislative function; the conditions on which the Act of 1895 authorizes such an applica-

tion cannot affect its real nature; they only serve to limit for the time being the extent of the evil involved.

We have assumed, as was assumed in argument, that the Act of 1895 purports to confer the powers in question upon a judge in his exercise of the judicial power vested in the Superior Court; and does not purport to appoint for the exercise of the powers an executive officer designated by an official title instead of by name. If the latter were true, the judge would be at liberty to accept or decline the appointment, and this court would have no jurisdiction to review his action. Legislation authorizing process (mostly under the misleading name of "appeal") for invoking the judicial power, to be returned to a judge of the Superior Court, or to the "Superior Court or any judge thereof," has produced some confusion in respect to the nature of the power thus exercised. This court has decided that a "writ of error" (which formerly, in connection with the auxiliary means of reservation, was the only process for calling into action its jurisdiction) does not lie without a judgment or an award in the nature of a judgment; *Williams* v. *H. & N. H. R. R. Co.*, 13 Conn. 110, 118; and also that this court has cognizance only of writs of error from the Superior Court. *Green* v. *Hobby*, 8 Conn. 165; *Humphrey* v. *Marshall*, 15 id. 341, 345; *Trinity College* v. *City of Hartford*, 32 id. 466, note. But these decisions did not hold that judicial power could be exercised by a judge of the Superior Court only when holding a stated session of court. The legislation which followed the decision in *Trinity College* v. *City of Hartford*, providing for a proceeding in error to this court from the final judgment rendered by a judge of the Superior Court in the exercise of his jurisdiction, could have no application unless such judgments are rendered in the exercise of the judicial power vested in the Superior Court. In *Clapp* v. *City of Hartford*, 35 Conn. 66, 73, 220, 222, decided shortly after the enactment of this legislation, language is used indicating that a judge in such case does not exercise that power, and this language is followed in the dissenting opinion in *Central Ry. and Electric Co.'s Appeal*, 67 Conn. 228. But such views cannot be main-

tained. "The Superior Court," in which judicial power is vested by the Constitution, is a magistracy consisting of the judges. The manner in which they shall exercise that power must to a large extent be governed by legislation in respect to procedure. Ordinarily that power can only be exercised at a formal session of court, which may be held for some purposes by one judge and for other purposes by two or more judges. But some things within the limits of judicial power may more properly be done by a judge in chambers; and jurisdiction which should ordinarily be entrusted only to a judge while holding a formal session of court, may, in cases of emergency, be exercised in vacation. That most important portion of judicial power invoked by the writ of *habeas corpus* would be seriously crippled if it could only be exercised at a formal session of court; so with the granting of injunctions and other incidents of chancery jurisdiction. A large portion of the judicial power, from its very nature, can be lawfully exercised only at a formal session of court; and it may be true that the exercise of other judicial power by a judge in chambers, justifiable in case of emergency, has been carried too far, and that it would be better if all "appeals," or other process intended to invoke the judicial power, should be made returnable to a court in session, unless in plain cases of emergency; but when process for bringing such matters before a judge in chambers is provided by law, the jurisdiction which he exercises must be within the judicial power vested by the Constitution in "the Superior Court." This view is indicated in our decision in *Central Ry. and Electric Co.'s Appeal, supra.* We think the Act of 1895 intended to impose the duties therein prescribed, upon a judge of the Superior Court in his exercise of "the judicial power" granted to the judicial department; as the present application calls for an exercise of power which is not a judicial power within the meaning of the Constitution, it should have been dismissed.

In no way has the confidence of the people in their Superior Court been more clearly shown, than in the increasing number of instances in which special process has been provided for obtaining in a summary manner its aid in protect-

ing rights liable to be infringed by the action of executive officers and administrative boards. This court fully appreciates the desirability and necessity of enlarging and simplifying procedure, so as to call into action in the most speedy and effectual manner the judicial power for the purpose of dealing with all questions arising under changing conditions, which it may properly determine; and has endeavored to construe legislation for that purpose, sometimes perhaps with apparent inconsistency, so as to give the fullest possible effect to the legislative intent. The law under consideration, however, goes too far. It involves a recognition by the court of a right to exercise powers plainly beyond the scope of that judicial power confided to it by the Constitution, and to exercise these powers not as incident to some legitimate judicial function, but in the first instance independent of any purpose except the mere execution of the powers. We cannot recognize such a right, because the recognition leads inevitably to the obliteration of any line of separation between the judicial and other departments of government.

There is error in the judgment complained of, and it is reversed.

In this opinion the other judges concurred, except BALDWIN, J., who dissented.

BALDWIN, J. (dissenting). I concur in the view that divorces may be granted by the General Assembly, in cases where no court has jurisdiction to act, and that the judgments in *Starr* v. *Pease*, 8 Conn. 541, 547, and *Day* v. *Cutler*, 22 id. 625, can therefore be supported. I also concur in overruling the decision in *Wheeler's Appeal*, 45 Conn. 306, but do so upon the ground that the legislation which was there in question assumed to grant to a particular person a special and exclusive privilege from the community, of applying for extraordinary judicial relief, as to a particular cause of action, in derogation of the general laws. I dissent, in other respects, from the judgment and opinion of the court.

The whole legislative power of the State is vested in the

General Assembly. Except for the few restrictions which the Constitution imposes upon it, that body is as free and untrammeled as the people would themselves have been, had they retained the law-making power in their own hands, or as they are in adopting such constitutional amendments, from time to time, as they think fit. *State* v. *Williams*, 68 Conn. 131, 149.

One of these restrictions is the subject of Art. II, entitled, " Of the Distribution of Powers." As originally reported to the constitutional convention by the committee charged with the duty of preparing the draft of a constitution, this article read thus :—

### " ARTICLE SECOND.

#### " *Distribution of Powers.*

" § 1. The powers of government shall be divided into three distinct departments, and each of them confided to a separate body of magistracy, to wit, those which are Legislative, to one ; those which are Executive to another, and those which are Judicial to another.

" § 2. No person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted."

This article, except for some merely formal alterations in the first section, was a copy of one adopted by Mississippi in the preceding year. 2 Poore's Charters and Constitutions, 1056. Objection was made in our convention to the second section, and ten days later that was struck out, without a division. Journal of the Const. Conv. of Conn. pp. 78, 55.

This seems to me clearly to evince an intention not to attempt to limit the functions that might be imposed upon those holding a place in any particular one of the three magistracies, to such as should be strictly incident to their special department. It was sufficiently implied from the first section, in connection with the three following articles, relating to the legislative, executive and judicial departments, that no legislative power should be exercised except by the Gen-

eral Assembly, and no judicial power except by judicial officers. The supreme executive power (not, as in the Constitution of the United States, the executive power) was also exclusively vested in the Governor. But the framers of our Constitution, differing from many of those who had fulfilled similar tasks for other States, recognized the fact that it is practically impossible to establish in every instance a plain line of demarcation between legislative, executive and judicial functions, and deemed it unnecessary to deprive the State of such services as it might desire from any of its citizens, because he held office in a department to which they might not properly pertain. See 1 Story on the Constitution, § 524; Pomeroy's Constitutional Law, § 173. Certain judicial and executive officers were, by Art. X, § 4, expressly debarred from the General Assembly, but I find no other provision to prevent the discharge by any magistrate, of public duties in addition to those peculiarly belonging to his special department, whether he assume them voluntarily, or they be imposed as a statutory duty.

There are powers of government which, in one sense, are, as the case may be, legislative or judicial, and in another sense are not. The powers ordinarily granted to municipal corporations to regulate their local affairs and pass by-laws or ordinances, are of a legislative character. Such ordinances have, within their proper sphere, the force of law; but no one would contend that they are void because not passed by the General Assembly. The rules of practice and pleading prescribed by the judges of the Superior Court from time to time are also law as to the cases to which they apply; but the legislative action from which they proceed is really made by the statute which authorizes them an incident of judicial power. The jurisdiction long exercised by our courts with respect to the layout of new highways, is of an administrative quite as much, to say the least, as of a judicial nature. The General Assembly might itself give such relief, and sometimes does. *State* v. *Williams*, 68 Conn. 131. It might confide these functions to an administrative board, like the railroad commissioners. It can give an appeal from such a

board to the courts.　*Westbrook's Appeal*, 57 Conn. 95, 104;
*Fairfield's Appeal*, ibid. 167, 172.　It can give a similar ap-
peal to a tax-payer who claims that his property has been
assessed upon an undue valuation; or who objects to the
licensing of a particular liquor seller.　Such an appeal may
serve to turn the matter of controversy into a cause of a judi-
cial nature.　*Beard's Appeal*, 64 Conn. 526, 534.　Yet its
origin may still so far determine the form of proceeding as
to leave the court free to exercise a discretionary power, un-
fettered by the ordinary rules that govern judicial trials.　Its
function is, in truth, one both judicial and executive in its
nature, and so one which the General Assembly might prop-
erly commit to either the judicial or executive department,
or to both.　*Hopson's Appeal*, 65 Conn. 140, 146.

Our statutes were revised in 1821, three years after the
adoption of the Constitution, by a very able commission,
headed by CHIEF JUSTICE SWIFT.　They fully appreciated
the great revolution that had been accomplished by the con-
stitutional distribution of the powers of government.　Rev.
of 1821, p. 150.　Part of their task was to weed out all exist-
ing legislation that was inconsistent with it.　Nevertheless
this Revision retained the old provisions authorizing the
County Courts to lay county taxes, and added one charging
them with the duty of taking care of, letting, selling or buy-
ing, county property, at their discretion (pp. 141, 250); gave
any two justices of the peace in any town power to make
rules for confining or killing dogs, when necessary for pub-
lic safety (p. 179); authorized any justice of the peace to
commit a witness who refused to answer any proper question
put to him by grand jurors, meeting as a court of inquiry
(p. 260); and forbade tanning, except by persons who had
proved their skill to the County Court and received a license
from it for the purpose (p. 308).

Our statutes, since the Revision of 1821, have contained
continually increasing grants of jurisdiction to our courts and
judges over matters of administrative procedure.　They rest,
it seems to me, on solid ground of public convenience and
practical necessity, and if it be claimed, as in this case, that

the constitutional provision as to the distribution of powers has been transgressed, "the sufficient answer is," to quote from a recent opinion of this court, in which all the judges concurred, "that these great functions of government are not divided in any such way that all acts of the nature of the functions of one department can never be exercised by another department; such a division is impracticable, and if carried out would result in the paralysis of government. Executive, legislative, and judicial powers, of necessity overlap each other, and cover many acts which are in their nature common to more than one department. These great functions of government are committed to the different magistracies in all their fullness, and involve many incidental powers necessary to their execution, even though such incidental powers, in their intrinsic character, belong more naturally to a different department." *In re Application of Clark*, 65 Conn. 17, 38.

Courts may properly be called upon to aid administrative tribunals in the exercise of their powers, whenever there is need of judicial relief. The dignity and independence of the judiciary is in no way impaired by making it ancillary, in such cases, to the work of another department. *Interstate Commerce Commission* v. *Brimson*, 154 U. S. 447, 487.

The applicant in this case holds a franchise from the State for the construction of a railway in certain streets in the city of Norwalk. The general laws provide that in such a case the city authorities, or the Superior Court, or a judge thereof, on appeal, shall first approve the plan of construction, and that a neglect by the city either to approve or disapprove, within a time specified, shall be deemed equivalent to a disapproval.

It was undoubtedly competent for the General Assembly to grant this franchise, and to guard against its improper exercise by giving the city supervisory powers. It was equally within its appropriate domain to grant an appeal to some suitable tribunal from any unreasonable conditions which the city might impose. I do not think that it can be said, as matter of law, that the Superior Court, or a judge thereof, is an unsuitable tribunal, or one upon which the Constitution forbids such a duty to be imposed. The function so conferred

upon it may, perhaps, be regarded as one both judicial and executive in its nature. If so, the long-continued practice of the State has settled, if it was ever doubtful, to quote from another of our recent opinions, "the true meaning of the constitutional requirement that judicial and executive powers shall each be confided to a separate magistracy, so far as it affects this question. Such a practical construction may safely be accepted, when the theoretical distinction to be drawn by the court must be subtle and doubtful." *Hopson's Appeal*, 65 Conn. 140, 146.

I think, however, that the appeal to *Judge Hall* may fairly be regarded as a judicial proceeding, calling for the exercise of judicial power. He was bound to dispose of it in accordance with the fundamental rules of law. *Hopson's Appeal*, 65 Conn. 140, 148. His decision, subject to that limitation, was "final and conclusive upon the parties." Public Acts of 1895, p. 631. Here is a cause, brought before a judicial magistrate, to redress a wrong, and so obtain the benefit of a public grant; known rules of procedure; a party plaintiff and a party defendant; provision for a final judgment determining the right in controversy ; and for an appeal to this court for error in law. *Central Railway and Electric Company's Appeal*, 67 Conn. 197, 206. Such a proceeding, it seems to me, may fairly be termed judicial.

But if it be deemed to involve only an exercise of *quasi*-judicial or administrative power, for reasons already stated I think such a power can be lawfully conferred on a judge of the Superior Court. Controversies as to the manner in which the use of a franchise, granted for the public benefit, shall be guarded in the public interest, may ordinarily be settled either by legislative, judicial, or administrative proceedings, at the will of the legislature, as it may be expressed in the grant, or in the general laws passed to regulate its exercise.

The fact that the city of Norwalk took no action upon the plan submitted by the railway company, does not seem to me to vary the appellate character of this proceeding. Inaction, under such circumstances, was as prejudicial to the company as adverse action. It is always competent for a legislature

to treat a failure to dissent within a reasonable time as equivalent to assent, or an omission to accept as equivalent to a refusal.    *Gilfillan* v. *Union Canal Co.*, 109 U. S. 401.

I do not, however, regard the duty of the judge of the Superior Court to take cognizance of this petition, as at all dependent on its being in the nature of an appeal.   In my opinion, it would have been the same, had the statute authorized the submission of the plan of construction to him as an original proceeding.    *U. S.* v. *Ritchie*, 17 How. 525.   The Constitution required the establishment of a Superior Court, but its "powers and jurisdiction," as well as those of all inferior courts, were left to "be defined by law."    Art. V, § 1.    The statute, which governs this case, is such a law. It defines the powers and jurisdiction of the Superior Court and of its judges as to a particular class of controversies. A difference of opinion between a municipal corporation and a private corporation as to what is a reasonable use of a legislative franchise affecting the public highways, which difference must be settled before the franchise can be used at all, seems to me to present a case which it is eminently proper to place within the jurisdiction of a court.    An analogous proceeding at common law was that by writ of *certiorari*, in the exercise by the Court of King's Bench of a general superintending power over not only inferior courts, but any persons invested by the legislature with power to decide on the property or rights of the citizen.    *Le Roy* v. *Mayor*, 20 Johns. 430, 438 ; *Mendon* v. *County Commissioners*, 2 Allen, 463, 465.    Had the General Assembly authorized a railway company, whose plan of construction, though duly submitted to the city authorities, had neither been approved nor disapproved, to apply to the Superior Court for a mandamus to compel them to act, there could have been no objection to such a remedy.    But if such a matter can be brought before the judiciary in that way, is it not a mere question of legislative policy whether an opportunity shall be granted to seek full relief in the same forum, by substituting for an authority that has failed to do its duty an authority not less fitted to decide impartially, and better fitted

610          JULY, 1897.

Norwalk Street Ry. Co.'s Appeal.          Vol. 69

to weigh evidence and construe the law? To me it seems also a mere question of legislative policy, whether or not to confer upon the courts in the first instance the right to pass upon the plan of construction proposed as the mode of exercising a railway franchise. A law to that effect would define their jurisdiction none the less because it extended it. It would remit for judicial decision an administrative question, but one involving rights of property, and so affecting large public interests as to call for a prompt and final decision. It would, in my view, become a judicial question as soon as the law brought it before judicial authority in a judicial proceeding. *People* v. *Long Island R. R. Co.*, 134 N. Y. 506, 31 Northeastern Rep. 873.

A motion for a rehearing was filed by the Norwalk Street Railway Company in August, 1897, and argued at the succeeding October term of this court held in Bridgeport.

*John W. Alling* and *George D. Watrous*, with whom were *J. Belden Hurlbutt* and *Winthrop H. Perry*, for the motion.

*Goodwin Stoddard*, with whom was *Edward M. Lockwood*, in opposition to the motion.

PER CURIAM. The motion is denied. The appeal to *Judge Hall* was taken under the provision of the Act of 1895, authorizing an appeal whenever the municipal authorities shall fail to notify the railroad company of their decision as prescribed, and transferring in such event to the court, "the same powers with reference to said plan and the acceptance or modification thereof, that said municipal authorities would have had under the provisions of said Act" of 1893. This appeal should have been dismissed, because the court had no jurisdiction to entertain such an application; and for this reason we reversed the judgment.

Counsel now claim that the appeal to *Judge Hall* was also an appeal under the preceding provision of the Act of 1895, authorizing an appeal from any "decision, denial, order or

direction ; " and requiring such appeal to be by petition stating specifically the portion of such decision, etc., appealed from, and the reasons of such appeal ; and urge their failure to argue this claim upon the original argument as a ground for granting the present motion.

The considerations now suggested in support of this claim, as well as those in further support of the appellant's main contention, were carefully weighed before our decision was announced.    We held that the appeal to *Judge Hall* was not taken from any decision, etc., under the first provision of the Act of 1895, but was taken solely under the later provision which we held to be invalid.    The judgment of reversal simply directs the dismissal of the application to *Judge Hall*, for want of jurisdiction; it is not a bar to the new presentation of a plan to the city council and a proper appeal, if occasion shall arise, under the first provision of the Act of 1895.